In re CUSTODY OF JENNIFER LYNN NODOT.—(MARY VARICK NODOT, a/k/a Mary Trouille, Petitioner-Appellant, v. GUY ANDRE NODOT, Respondent-Appellee.)

First District (2nd Division)   No. 79-876

Opinion filed February 26, 1980.

Howard William Broecker and Alan D. Hoffenberg, both of Ehrlich, Bundesen, Broecker, Hoffenberg & Seraphin, P. C., of Chicago, for appellant.

Mildred G. Peters, of Northfield, and James T. Friedman, of Chicago, for appellee.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Mary Varick Nodot (hereinafter the mother) appeals from the trial court's order granting the counterpetition of Guy Andre Nodot (hereinafter the father) for change of custody of their minor daughter, Jennifer Lynn, from the mother to himself. We affirm, for reasons which follow.

The mother, an American citizen, and the father, a French citizen, were married on April 5, 1971, at Loches, France. On June 19, 1975, while residing in Evanston, Illinois, their daughter Jennifer was born. The mother and father were divorced by a decree entered by the circuit court of Cook County on September 27, 1977, on petition of the mother, who was granted custody of Jennifer. On April 24, 1978, the mother filed a sworn petition to remove Jennifer, then two years old, from Illinois, giving as reasons that she planned to marry a French citizen[1] studying in Chicago who had a job waiting "\* \* \* for him in Singapore, and other opportunities in Europe." She was desirous of leaving Illinois to marry in France and "\* \* \* reside with her new husband in Singapore or any other location where he [might] obtain employment," and of having her child reside with her and her new husband. The removal sought was alleged to be in Jennifer's best interests because it would provide a "two parent environment," improve her financial position and opportunities for travel and education, and expose her to the mother's new inlaws and their families and thus expand her family circle. The mother acknowledged the need to alter visitation arrangements for the father and agreed to keep him advised of Jennifer's location, health and progress. The father's answer to the petition denied that removal would be in Jennifer's best interests, alleged to the contrary that it would seriously endanger her

---

[1] Following the divorce, Mrs. Nodot married Bruno Trouille, the person to whom reference was made.

mental and physical health, and asserted that it would be a grave detriment to her to see the father only on rare occasions.

The father also filed a counterpetition for change of custody on May 12, 1978, the same day as the answer was filed. It alleged that the mother had been employed on a full-time basis since entry of the divorce judgment and prior thereto, and since April 30, 1976, Jennifer had been in the care of Mrs. Pauline Rapp at an Evanston day care center approved by the Illinois Department of Children and Family Services from 8:15 a.m. to 5 p.m. for five days per week, thus reducing the time of the mother's involvement with the child to a few hours each day. The father worked as an architect in Winnetka and visited Jennifer at the day care center during the week. In addition, he saw her on 24-hour weekend visits and one night every other week. At the day-care center Mrs. Rapp provided a consistently stable environment for Jennifer conducive to her proper development, which the father would continue to maintain if granted custody. He resided "with a family where there are 2 young children" with which Jennifer had become close during the aforesaid visitation periods. If removal were allowed on the mother's terms, the new and constantly changing environment to which Jennifer would be exposed would seriously and irreparably endanger her mental, moral, physical and emotional health and be devastating to her future well-being. By contrast, if the father were given custody, she would remain in the daytime care of Mrs. Rapp and reside with a family in which she had become "integrated." The mother's remarriage and her intention to leave the country with her new husband were alleged to be the statutory change of circumstances since entry of the custodial order which would allow for modification.

The mother's answer to the counterpetition was filed on June 8, 1978, and contained denials of its material allegations. On June 19, the father filed a motion for an injunction to restrain the mother from removing Jennifer, alleging that she had advised him she intended to go to France with the child in early August and would not return, and that he believed she planned to do so without submitting to a hearing on the custody issue. The mother filed another petition on July 6, 1978, stating that she had remarried and wished to take Jennifer to France on or about August 15, 1978, to visit her new husband's family, subsequently leaving to reside in Indonesia with her new husband, who was to be employed there. She was fearful that the court would not have an opportunity to rule on the petition prior to her planned departure date, and prayed for permission to remove the child temporarily without bond subject to return for the hearing. Although set for hearing on July 26, no ruling on the July 6 petition appears of record.

The mother's petition for removal and the father's for change of

custody were heard together on August 29 and 30, 1978. In passing we note that greater clarity could have been achieved in this case had the trial court conducted the proceedings in bifurcated hearings upon the two issues thus presented. Immediately prior to the taking of evidence the father submitted an affidavit in support of his counterpetition "* * * to comply with the new * * * dissolution act," reiterating the major allegations contained in his counterpetition and emphasizing that the mother had given "* * * secondary priority to the child in terms of her interests and activities with the result that the child had lacked the maternal attention as might reasonably be expected for a child of such tender years." He submitted that her proposal to permanently remove the child was an example of her placing Jennifer's welfare after the satisfaction of her own desire for travel and adventure, and that her recent remarriage, having had inadequate time to establish stability, would exacerbate the child's insecurity in a new environment.

In his opening statement counsel for the mother reaffirmed that she and her new husband, Bruno Trouille (hereinafter Bruno) were planning to go to Jakarta, Indonesia, incident to Bruno's employment, and two years thereafter to France. Bruno was scheduled to leave for Jakarta the day following the first day of the hearing and therefore testified first. He was employed as a senior field engineer by an international service company and was familiar with Indonesia, having previously spent two years there. He and his family would reside in a six-room, three bedroom house located in a residential suburb where "American standards" of sanitation were maintained. A community of 8,000 non-Indonesians resided in Jakarta, 3600 of whom were American. Indonesia had been a parliamentary democracy since 1945. A military uprising occurred in 1965 during which thousands of Indonesians were killed, and some political unrest was experienced in May of 1977, the time of national elections. Eighty million people reside on the island of Jakarta, making it one of the most densely populated areas in the world. Thirty million of these live "* * * on a less than substantial [sic] level." The rainy season there extended from November through April, resulting in extremely high humidity, averaging about 83 percent. He planned for Jennifer to attend an international school with 1560 students where English was spoken.

Bruno had not applied to any other companies for employment, having "no intention to leave the company" he was working for. On cross-examination, however, he indicated that he "did some investigation" of employment alternatives, but "had no offer" which compared with the earnings and work he was doing for his present company. He had spent time with Jennifer since he had first met the mother, in September of 1977; he had been on vacation with her, disciplined her when necessary and treated her as a daughter. He and the mother had at first intended to

be married in France during August of 1978, but married locally in April because "[o]ur lawyer just advised us that it would be better ° ° °." Bruno acknowledged that his preference was to live in Paris rather than Jakarta, but he had to go to Jakarta first. When he was asked whether, in the event of an adverse ruling by the court on the mother's removal petition, he would seek employment in the United States or go to Jakarta nevertheless, the mother's counsel objected to the question and was sustained.

The mother testified that, pursuant to her new husband's imminent transfer to Jakarta, she had made inquiries about the character and facilities of the International School there. It had a library of 26,000 books, a teacher-student ratio of 1 to 15 and courses were conducted in English. Since her divorce she had been working as a French editor for a publishing company in Glenview, Illinois, with Jennifer having been in the care of Mrs. Pauline Rapp at a small day-care center from 8 a.m. to 5 p.m. five days per week. She did not plan on working in Jakarta, but would remain home with Jennifer. Bruno spent a good deal of time taking care of Jennifer, both alone and in the presence of the mother, who testified that "they really enjoy being together." She was willing to alter visitation arrangements if the court allowed Jennifer's removal, specifically by allowing a long summer vacation period for visitation with the father, and to institute changes in the present child support agreement. Jennifer was "extremely happy and well adjusted." The child's regular contact with the father and daily care of Mrs. Rapp had had a beneficial effect on her development. She initially told the father and alleged in her petition for removal that she and Bruno would be moving to Singapore, rather than Jakarta, because they didn't know until two months before the hearing exactly where Bruno would be assigned. He wanted to go where he would have "the best career possible," but ultimately preferred to live in France "because that is where his family is."

Respondent's exhibit No. 8F was identified by the mother as a letter written in French on March 1, 1978, by herself to the father's parents, with whom she had maintained contact after the divorce. She had written: there is a possibility we will be able to live in Paris, "which would please me very much," and very little chance we will stay in Chicago, because Bruno does not like life in the United States and does not want to stay here; there are very few companies here that would offer him the kind of job that he would want; he wants to live in a foreign country, in Asia or in South America, for five or six years, and then go back to France; and I have always been attracted by the idea of living in a foreign country, although the situation is very complicated because of Jenny. She wrote further:

"° ° ° I know this will be very hard for Guy, as well as for my

family, to be separated from Jenny and to be able to see her once or twice a year. I am sorry to hurt them. But for me there is no choice. I love Bruno and I am happy with him, and I want to marry him, so I have to follow him."

She explained that at the time the letter had been written they thought Bruno's field training would last longer than two years. She had discussed the proposed removal thoroughly with the father when she wrote it. She "knew from Bruno" what the situation was in Singapore regarding schools and other quality-of-life matters.

The evidence deposition of Joy Ogden-Stigger, a caseworker with the Cook County Department of Supportive Services who investigated the households of both parties, was admitted into evidence by stipulation. She interviewed the mother and father in their respective homes and observed Jennifer with Bruno, but did not observe Jennifer in the Winnetka home in the presence of the father and Jane Almquist, in whose home he was then living. When observed in the presence of the mother and Bruno, Jennifer appeared to be very happy, content and well adjusted, and to relate very well to them both. She also appeared to Mrs. Ogden-Stigger to have a good relationship with the father. As to whether Mr. Nodot's place of residence provided a "proper atmosphere" for Jennifer, Mrs. Ogden-Stigger stated: she wasn't sure about the stability of the relationship; the Nodot-Almquist plans to marry were uncertain; she didn't know what the relationship was; and there did not then seem to be a commitment to what would be recognized as a legitimate family. In her personal opinion, as distinguished from her "expert" opinion, children are "better off with a good maternal person." If Jennifer was to have no contact with her father, she suspected it would be harmful; he should have maximum contact with her.

Testifying for the father, Pauline Rapp, a day-care mother licensed by the Illinois Department of Children and Family Services, stated that she took care of Jennifer 8 a.m. to 5 p.m. on weekdays. She seemed to be developing well and normally for a child her age, with good physical and emotional health and ability to deal with other children. A "very close relationship" existed between Jennifer and the father, who visited her at the day-care center about once per week.

The father testified that he worked in Winnetka as an architect. He resided there at the home of Jane Almquist with her two children, ages 10 and 15 years old, by a prior marriage. Jennifer had a room of her own when she stayed overnight during visitation periods, which, in addition to the times indicated in his petition, also occurred for most of the month of April. He intended to stay in Winnetka and reside there with Jennifer if granted custody, maintaining her in the daytime care of Mrs. Rapp. He and Ms. Almquist were engaged and planned to be married in January of

the coming year.[2] Since 1972 the mother had indicated to him that she wished to live in France. When their divorce suit was pending she told him "that she would never leave the country because it would hurt Jennifer," a promise upon which he relied in declining to seek custody.

On August 30, 1978, at the close of the hearing, the court denied the mother's petition for removal; transferred custody of Jennifer to the father *instanter*, with the mother to have the same visitation rights as the father had previously enjoyed; modified the original judgment as to custody and visitation accordingly; and ordered the father to pay all support costs for Jennifer, terminating the support provisions of the original judgment. After the court announced its ruling, counsel for the mother asked the court if the mother could retain custody should she remain here. The court replied that it had to base its judgment on the petition and the evidence adduced. Pursuant to its order, the court made the following written findings of fact:

"A. That there is good cause for the Court permitting a hearing on change of custody within two years of the original custody order based on the child's best interest.

B. That there have been substantial changes of circumstances relative to the welfare of the minor child wherein physical, mental, or emotional health is in jeopardy, and the child's best interests are served by transferring her custody to the respondent-father instanter.

C. That a removal of the child permanently from the United States would not be in her best interests."

The mother appeals from that portion of the court's order granting the father's counterpetition for change of custody on the ground that the evidence presented by the father was insufficient to sustain a change of custody. This contention has as its express premise the view that the order appealed from was grounded solely in the contemplated removal of the child to Indonesia. We disagree.

Modifications of custody decrees sought within two years of their entry are governed by section 610(a) of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 610(a)) (hereinafter Act), which provides in relevant part that no motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court believes the child's present environment may endanger seriously his physical, mental, moral or emotional health. It must find under section 610(b) upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the

---

[2] The father represented to this court that the contemplated marriage has taken place.

circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child. In applying these standards, under section 610(b)(3) the custodian appointed pursuant to the prior judgment must be retained unless the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him. The Commissioners' Note to section 409 and related sections of the Uniform Marriage and Divorce Act, from which the statutory language is taken almost verbatim (*In re Custody of Harne* (1979), 77 Ill. 2d 414, 418, 396 N.E.2d 499), emphasizes that underlying the provisions to maximize finality of initial custody determinations is a policy that the best interests of the child are served by fostering continuity of relationships and surroundings and discouraging change. 9A Uniform Laws Annotated §§409, 402, Commissioners' Note (1979); see also *In re Custody of Ehr* (1979), 77 Ill. App. 3d 540, 545, 396 N.E.2d 87.

With the foregoing rules as the touchstone, the present record demonstrates significant potential disruption of the existing custodial milieu. Beyond the planned move to Jakarta, other relocations to disparate cultural and climatic environments were also possible within the next several years. The evidence contained in the mother's March 1, 1978, letter to the father's parents shows that the mother was inclined to live abroad whether in Asia, South America or France regardless of the effects such emigrations might have on Jennifer and her relationships with others, including the father and the mother's parents. This and other evidence that the mother and Bruno made their plans according to their own personal and professional goals supports the father's allegation that the mother had given secondary priority to Jennifer in terms of her own interests and activities and further dilutes the elements of stability and continuity in her guardianship of the child. The trial court was not bound to believe subsequent explanations to the contrary.

The mother's assertion that there is nothing in the record to indicate she would have left the jurisdiction in the event the trial court denied her petition for removal is not persuasive. Her counsel indicated in his opening statement that Bruno was leaving to work in Jakarta the following day, and they both spoke in certain terms of their intention to move there together. During Bruno's cross-examination he was asked directly whether he would relocate if the removal petition were denied; sustained objection was made to the question by the mother's counsel, who thus actively avoided apprising the trier of fact of any other intention, in the event of an adverse determination, than what had already been expressed. Nor did the mother's emergency petition for rehearing, filed on September 18, 1978, and dismissed by the trial court pursuant to the

father's motion on October 4, contain any renunciation of her intention to move abroad. Only before this court, in her petition to stay enforcement of trial court orders pending appeal and in subsequent pleadings, has she represented that she and Bruno have abandoned any such intention and have settled permanently in this area. Under these facts we cannot find error in the trial court's having concluded that the Trouilles were committed to go to Jakarta and other points irrespective of its ruling.

The cases relied upon by the mother as to this issue, *Garland v. Garland* (1974), 19 Ill. App. 3d 951, 312 N.E.2d 811, *Radivojevic v. Radivojevic* (1973), 11 Ill. App. 3d 116, 295 N.E.2d 570, *Jingling v. Trtanj* (1968), 99 Ill. App. 2d 64, 241 N.E.2d 39, and *Dokos v. Dokos* (1967), 88 Ill. App. 2d 330, 232 N.E.2d 508, are authority for the principle that removal of a child by a custodial parent from Illinois does not *alone* provide sufficient grounds for revocation of custody; each involved a single proposed or effected removal from the jurisdiction. In the case at bar the mother proposed at least two relocations within a three-year period, with interim destinations changing according to the requirements of Bruno's employment, over which, accepting his testimony at the hearing, he had no control. The uncertainty and potential disruption of continuity inherent in this custodial situation distinguishes the instant case from those last hereinabove cited and provided a sufficient basis for the trial court's determination. In making its ruling the trial court specifically questioned the effect of multiple relocations upon the child's stability.

■■■ Referring to subsection (b), section 610 of the Act, the mother avers that the evidence did not show and the court did not find, as required by 610(b), that the child's welfare was seriously endangered by the standing custody arrangement. She correctly emphasizes that such a finding is a jurisdictional prerequisite which must be satisfied before the "best interests of the child" standard may be applied to reconsideration of the prior custody order. Our supreme court addressed the requirement of findings in custody modification orders in its decision in *In re Custody of Harne* (1979), 77 Ill. 2d 414, 421, holding in pertinent part "* * * that section 610(b) requires a trial judge to make explicit findings that * * * subsection * * * (3) is applicable prior to modifying a custody judgment * * *." In *Harne*, however, the court found sufficient under the statute the following language, contained in the trial court's written order (77 Ill. 2d 414, 421-22):

> " '[T]he Respondent does not have the stability or ability that is necessary to maintain and care for the children, that they have been living with their grandparents rather than the Respondent, and that under these circumstances, their present environment could seriously affect their physical, mental, moral or emotional health. Therefore, the Court finds that it is in the best interests of

the minor children that the Petitioner have their care, custody and control.' "

Thus explicated, the requirement articulated in *Harne* was also satisfied in the case at bar. The trial court's written findings in the present case, while not as complete as they might have been to clarify the grounds of the order (*Harne*, 77 Ill. 2d 414, 421), nevertheless satisfy section 610(b).

■■ The mother insists that, even if the mandatory findings were made, there was no evidence of serious endangerment to Jennifer of any kind, and the aforesaid threshold requirement was therefore wanting in substance if not in form. As contemplated in the statute, a serious present endangerment to physical, mental, moral or emotional health is not necessarily one which, if realized, must be manifested at once or within a certain discernible period of time; the long-range as well as immediate interests and welfare of the child are the subject of section 610(b). (See, *e.g., Harne*, 77 Ill. 2d 414, 422.) The trial court in the instant case was presented with evidence that Jennifer was substantially in the care of Mrs. Rapp and had a close relationship with the father; that the mother intended to take her first to Indonesia, perhaps South America and then to France, apparently out of devotion to her new husband and a personal desire for travel; and that their departure for Jakarta was unavoidable and, in Bruno's case, imminent. Considering this with further evidence that the situs of their new residence had recently changed from Singapore to Jakarta and that they might be compelled to accept additional sojourns in unidentified locations, we cannot say that the court's findings lacked foundation in the evidence. Ironically, the situation presented was such that the court might well have concluded the stability and continuity of the child's relationships and environment could be maintained only by a change in custody.

The mother claims that the trial court's ruling in this case would "establish a dangerous and wholly unacceptable precedent"; honest litigants seeking to remove minors from the jurisdiction by leave of court would be penalized for doing so, and dishonest ones rewarded by leaving the State and waiting for the other party to take action, thereafter receiving approval for the move from the court. This argument ignores the linchpin of custodial determinations, whether *de novo* or modifications of prior judgments: the best interests of the child (9A Uniform Laws Annotated sec. 409, Commissioners' Note (1973)). The mother had ample opportunity to apprise the trial court of any intention different from that she had expressed through her evidence, in the event the petition for removal was denied. By declining to do so, at one point actively, she made it necessary for the court to base its ruling upon her own evidence and Bruno's testimony, which was not presented as contingent upon the outcome of the hearing.

The mother argues that the trial court erred in construing the testimony of Mrs. Ogden-Stigger by failing to apprehend the nature of the relationship between the father and Jane Almquist, consequently transferring custody to a noncustodial parent living with a person to whom he was not married, citing *De Franco v. De Franco* (1978), 67 Ill. App. 3d 760, 384 N.E.2d 997, and *Jarrett v. Jarrett* (1978), 64 Ill. App. 3d 932, 382 N.E.2d 12, *rev'd* (1979), 78 Ill. 2d 337, 400 N.E.2d 421. Both *De Franco* and, more recently, the supreme court's decision in *Jarrett* turned upon the existence of a sexual relationship between unmarried persons as a basis for modifying an initial custody determination. In the case *sub judice*, there was no direct evidence of such a relationship between the father and Ms. Almquist, beyond the fact that they lived in the same household and, according to the father, were planning to be married. Mrs. Ogden-Stigger's comments suggest that she was herself unsure of the nature of their relationship. Even assuming a conjugal relationship at the time of the hearing, the foregoing decisions are not applicable on their facts. In *Jarrett* the supreme court emphasized as a basis for its decision that the custodial parent had no plans to marry her inamorato and maintained the same attitude in oral argument before the court, when they were still unmarried and cohabiting. In the case at bar, the father has represented in his brief and oral argument that he and Ms. Almquist have married, pursuant to his intention as expressed to the trial court. The court in *De Franco* had before it an adulterous relationship between a custodial parent and a married man, and evidence that the children whose custody was at issue were aware of and had observed their sexual conduct. No such evidence is revealed in the present record as to the father and Ms. Almquist, both of whom were unmarried at the time of the hearing.

The mother urges reversal because the father failed to comply with the requirements set forth in section 610(a) by not filing an affidavit in support of his counterpetition until the date of the hearing. The language of the statute she relies upon makes no mention of any time, mandatory or otherwise, by which such affidavits should be filed. Further, this argument was not raised in the trial court, nor does the mother now allege any prejudice as a result of the time of the affidavit's filing. It is therefore without merit as a ground for reversal.

For the reasons set forth above, the order of the trial court transferring custody of the minor child of the parties from the mother to the father is affirmed.

Affirmed.

STAMOS and DOWNING, JJ., concur.