*In re* MARRIAGE OF DONNA WHITE SWEET, Petitioner-Appellee, and ROBERT A. WHITE, Respondent-Appellant.

First District (2nd Division)    No. 81-1759

Opinion filed February 16, 1982.—Modified on denial of rehearing March 23, 1982.

Robert H. Snow, Ltd., of Chicago, for appellant.

Mark K. Morgan, of Midlothian, for appellee.

JUSTICE HARTMAN delivered the opinion of the court:
This appeal emanates from a particularly acrimonious custody contest between the natural parents over the only child born of their marriage, since dissolved, and raises procedural as well as substantive issues. For reasons which shall presently appear, the order of June 23, 1981, from which the appeal is taken, must be reversed and the cause remanded for further proceedings.

After four years of marriage, Robert (Robert) and Donna (Donna) White obtained a default divorce on July 7, 1972, upon stipulation between the parties. Donna was to be awarded sole custody of their only child, William (Bill), then age 2½. No evidentiary hearing relating to custody or fitness was then held. Both parties remarried and had children born to their new families. On August 10, 1977, Robert, a career soldier in the United States Army, petitioned for custody of Bill. The petition alleged, *inter alia*, that Donna and her present husband, David L. Sweet, had no permanent place of residence; lived in a variety of different States and locations; interrupted the lifestyle of Bill; and disrupted his school attendance. The only permanent address provided to Robert by Donna was her mother's address in Posen, Illinois, to which Robert sent monthly child-support remittances.

The trial court directed the Cook County Department of Supportive Services to conduct an investigation and prepare a report on the respective parties, which was done. The report noted interviews with the father, his wife and his mother; set forth allegations of insufficient food, clothing, discipline, education and supervision while Bill was in Donna's custody; concluded that Robert was a responsible father and husband; found no economic or emotional limitation to restrict him from having custody, but noted that no information was available on either the custody mother or her husband.

A letter, addressed to Donna in care of her mother in Posen, Illinois, containing a notice and a copy of the petition for change of custody, was

refused. Donna did not respond to the petition for change of custody. On December 15, 1977, the trial court awarded Robert custody and granted him "* * * full right and authority to take physical possession of * * * [Bill] wherever said child may be found." No findings were made by the trial court with respect to section 610(b) of the Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1977, ch. 40, par. 610(b)) in its modification of custody order.

In February of 1978, Robert went to a Fort Mills, South Carolina, school which Bill attended, presented the principal with a copy of the court order, and school authorities brought Bill to him. They went first to Fayetteville, North Carolina, then back to Fort Sheridan, Illinois, and, one month later, on to Karlsruhe, West Germany, where Robert was next stationed. Robert's family consisted of his wife, mother, three children and Bill. They lived in a four-bedroom apartment situated in a government complex. Robert did not notify Donna of Bill's removal, claiming he had no address or telephone number for her.

On February 27, 1979, Donna filed a section 72 petition (Ill. Rev. Stat. 1977, ch. 110, par. 72) and moved to vacate the December 15, 1977, order on grounds, *inter alia*, of improper service. Robert denied improper service, claiming that he served Donna with a copy of his petition for change of custody at the same address in Posen, Illinois, to which he had been sending child-support checks. Pursuant to Donna's motion, the court on August 27, 1979, ordered Robert to deliver Bill to O'Hare International Airport on September 15, 1979, for a one-month visitation period.

On September 14, 1979, Robert moved to suspend the operation of the order requiring him to deliver Bill at the airport pending further investigation. In support of this motion, Robert attached a number of letters, identified as exhibits. These included a letter from a pediatrician, an elementary school teacher, the principal at Bill's elementary school in Germany, the clinical director of the Karlsruhe Community Mental Health Service, and the community chaplain. The essences of those communications were that Bill was happy in his environment, and it would be disruptive and not in his best interest to remove him from his present home. A sworn statement by Bill, given to the base adjutant, stated that he got along well with his father and stepmother, with whom he would rather be, and that he was a better student while with them than while he was with his mother.

On September 14, 1979, the trial court denied Robert's motion to suspend the order of August 27, 1979, and ordered that Bill be delivered to O'Hare Airport by September 30, 1979. On October 3, 1979, the court ordered the Cook County Department of Supportive Services to conduct a medical and psychological examination of Bill. On that same day, Bill was presented in court by Robert's attorney and the court interviewed

him *in camera*. Bill stated that he liked living in Germany. His father, Robert, his stepmother and grandmother were nice to him. He wanted to visit with his mother for at least one month.

An evidentiary hearing on the purported section 72 petition was held on November 15, 1979. The hearing developed evidence that: Robert visited Bill at Donna's abode more than once during April of 1977; he did not know where Donna lived at various times from 1971 to 1977, nor street addresses at which she lived while a resident of Black Oak, Indiana, St. Joseph, Illinois, St. Louis, Missouri; and he did not know addresses of Donna's various residences in Chicago. Donna's mother, living in Posen, Illinois, was the contact concerning news of Bill. No change of address was ever requested by Donna. In July of 1977, Robert claimed, he did not know where Donna lived. At the close of Donna's case, the court denied her petition to vacate, but extended her visitation of Bill until further order of court, referring to this procedure as granting "temporary custody" of Bill to Donna. No appeal was taken from this order, entered on February 13, 1980.

On February 22, 1980, Donna petitioned for a change of custody alleging, *inter alia*, that Bill was "* * * happy in his surroundings, doing well in school and has indicated on numerous occasions that he desires to live with his mother in Posen, Illinois." At an evidentiary hearing held on March 12, 1981, on an amended petition, the court conducted another *in camera* interview with Bill, who now stated that he wanted to stay with Donna because she is a lot nicer than his stepmother. He did not like "Bob," his father. Since he has been living with his mother, he has called his father "Bob," instead of "dad" as he previously addressed him. He did not want to visit with his father and stepmother. He hated his stay in Germany. His mother and stepfather told him that his grandmother was a prostitute and a bad woman. At this hearing, Donna was "again" awarded temporary custody of Bill until further order of court.

On June 15, 1981, another evidentiary hearing was held on the amended petition. Donna testified that under the 1972 divorce decree Robert was given visitation rights only during the daylight hours in her house and presence, because Robert had homosexual tendencies.[1] From the time of her divorce to the present, she traveled a lot, but Bill was always in school during that time. In 1975, she went twice to Robert's house to talk to him because he was not visiting Bill. Robert's house was filthy, his children ran around naked, and when one boy got in front of the television, Robert kicked him in the face. When Bill arrived from Germany he was very skinny, had sores on his hair and body, and was

---

[1] The decree of divorce granted Robert visitation "* * * from noon to 8 p.m. on Saturday and only in the presence of [Donna] * * *." No reason was set forth either in the transcript of testimony or in the decree for this limitation.

very nervous. Bill said his stepmother had pulled his hair and caused the sores. He did not know how to use toilet paper. On October 17 or 18, 1979, she heard Bill tell her son, David, while they were in the bedroom, to commit an act of fellatio. She realized then that Bill needed psychiatric help and took him to Bremen Youth Commission. Bill's grades in school have improved over the course of time. Her husband was then unemployed and out of work for one year, but was starting his own business.

Bill testified that while in school in Fort Mills, South Carolina, his father, aunt and grandmother, came to pick him up. He went with them first to Chicago and then to Germany, where he lived for 16 months. He shared a bed with Bobby, his stepbrother, who "peed" in his bed every night and occasionally had bowel movements in bed. Sometimes his dad hit him on his rear end. He had scars and welts from a switch used on him by his grandmother while in Germany. After his return to the United States, his paternal grandmother told him that if he had oral sex with David, he would be able to stay with his mom and stepfather. He liked where he was then living, had many friends, and wanted to stay with his mother and stepfather.

Robert's mother, Mae Sutton, testified that she never told Bill to perform oral sex with his half-brother; and never beat him nor did Robert. He had no sores on his head or body. Since October of 1979, Bill had seen his father four times and had not once displayed any fear. On cross-examination she testified that she disciplined Bill sometimes by spanking him with a switch. Bill was happy in Germany and did not have any discipline problems which would require professional help.

Robert testified that since November 1980 he has been living in Raeford, North Carolina. Bill passed all of his classes in the school in Germany and was a member of the Cub Scouts. After Bill was informed that he would be required to return to the United States, he became nervous, and upset and couldn't sleep at night. He was taken to the doctors at Smiley Barracks Dispensary. When Bill was sent to the United States, he was clean, well groomed, and had no sores, welts or scalp problems. Neither he nor his wife has ever told Bill to perform any sex act at all.

A report from a psychiatrist, Dr. June C. Frye, dated January 5, 1980, was filed with the trial court on October 1, 1980. The psychiatrist noted a 20-minute interview with Donna, two 55-minute interviews with Bill, a telephone conversation with Don Sebek of the Bremen Youth Commission from whom Bill was receiving psychotherapy, and that no interview was attainable with Robert, who was then in Germany. The report concluded that Bill gave evidence of varied emotional disturbances and that his best interests would be served by allowing him to continue living in his present situation with his natural mother. The report qualified that

recommendation by noting inadequate information about either Donna or Robert and that psychiatric evaluations of both were necessary in order to determine in whose custody the boy's interests will be best served. No followup evaluation appears to have been made, and none appears in the record.

On June 23, 1981, the order of December 15, 1977, was vacated and the provisions of the 1972 divorce decree were reinstated with respect to child custody. The trial court gave as its principal reasons for the vacatur that the 1977 order granting Robert custody did not comply with the then newly enacted Illinois Marriage and Dissolution of Marriage Act; that the trial court did not know that Robert would remove Bill to Germany; and that the boy's best interests would be served by leaving custody with the mother. No reference was made to the 1980 psychiatric report. The trial court asserted that it was considering the proceedings before it as a "rehearing" of the December 15, 1977, change of custody order. No section 610(b) (Ill. Rev. Stat. 1977, ch. 40, par. 610(b)) findings were made. It is from this order that the appeal proceeds.

From the foregoing history of events it is evident that the underlying policy of section 610(b) of the Act, which favors the finality of child-custody judgments and seeks to make their modification more difficult (*In re Custody of Harne* (1979), 77 Ill. 2d 414, 420-21, 396 N.E.2d 499), was not followed in either the December 15, 1977, or June 21, 1981, custody orders. The manifestation of legislative aversion to custody changes set forth in that section, by which the legislature sought to promote stability and continuity in the child's custodial and environmental relations, appears to have been ignored. The situation affecting Bill's best interests has been exacerbated by the' fact that there was no evidentiary hearing relating to that issue, nor findings made, even at the time the initial order was entered in 1972; custody was agreed upon by stipulation of Robert and Donna to the divorce.[2]

■■ The suggestion made by Robert, that the December 15, 1977, order changing custody of Bill from Donna to Robert required no findings under the then new act, which took effect on October 1, 1977, is without merit. Section 801(b) of the Act (Ill. Rev. Stat. 1977, ch. 40, par. 801(b)) states clearly that the Act was applicable to actions pending prior to the effective date of the Act but in which judgment was not entered until after that effective date. Here, Robert's petition for change of custody was filed in August 1977, but judgment was not entered until December 15, more than two months after the Act had taken effect. Under these circumstances, the provisions of section 610(b)(1), (2), (3) applied (*In re Custody of Sexton* (1981), 84 Ill. 2d 312, 318-19, 418 N.E.2d 729; *Simmons v. Simmons* (1979), 77 Ill. App. 3d 740, 742, 396 N.E.2d 631; *Miller v.*

---

[2] The custody order of July 7, 1972, was entered by a different trial court.

*Miller* (1978), 65 Ill. App. 3d 844, 846, 382 N.E.2d 823), and some effort should have been pursued by court and counsel to articulate the reasons requiring the change of custody in light of the strong legislative policy. Only where a trial court sets forth explicit findings that subsection (1) (2) or (3) applies, can the intended boundaries of a trial court's discretion be reviewed intelligently. *In re Custody of Harne* (1979), 77 Ill. 2d 414, 421.

■■ The foregoing comments apply with equal force to the entry of the order of June 23, 1981, under the guise of a "rehearing" which the trial court, *sua sponte*, initiated in this case. No rehearing was sought by the parties, nor was such a procedure authorized by any statutory or case authority, as both parties to this appeal concede. The psychiatric report of Dr. Frye, which underscored the necessity for evaluation of the homes, surroundings and circumstances of both putative custodial parents was never mentioned in any of the transcripts of hearings after the date of its filing. Nothing appears to have been done, insofar as the record discloses, which suggest any effort to ascertain the suitability of either parent or their homes for custody of this child under current circumstances, rather than prior information. (See *In re Custody of Ehr* (1979), 77 Ill. App. 3d 540, 546, 396 N.E.2d 87; *Smith v. Smith* (1979), 73 Ill. App. 3d 423, 392 N.E.2d 292.) Whether the absence of section 610(b) findings may be considered jurisdictional or their absence may be considered as having rendered the order invalid (*In re Custody of Harne* (1979), 77 Ill. 2d 414, 419-22; *In re Custody of Nodot* (1980), 81 Ill. App. 3d 883, 891-92, 401 N.E.2d 1189), necessary evidence anticipated by the statute, irrespective of the articulation of findings, requires that this case be returned to the trial court for further proceedings directed to whether the putative custodial parents are in a position to present a satisfactory home setting for their child, particularly in light of the charges and countercharges made by the parents and their relatives against each other which reflect upon their suitability to be given custody.

Arguments relating to res judicata and reviewability raised by Robert, and harmless error argued by Donna, are inapposite to the circumstances presented here.

For the foregoing reasons the cause is reversed and remanded with directions to the trial court to vacate the June 23, 1981, order and to conduct the necessary hearings as will establish a proper basis for the custodial award under section 619(b) of the Act.

Reversed and remanded.

DOWNING and PERLIN, JJ., concur.