JUSTICE HARTMAN delivered the opinion of the court: This case is before us for a second time following additional hearings mandated by our decision in In re Marriage of Sweet (1982), 104 Ill. App. 3d 738, 432 N.E.2d 1098, in which we directed that the June 23, 1981, custody order be vacated and necessary hearings conducted in order to establish a proper basis for a custodial award under section 610(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (Ill. Rev. Stat. 1981, ch. 40, par. 610(b)).[1] The issues raised in the present appeal are whether the circuit court: made the required findings pursuant to section 610(b) of the Act (Ill. Rev. Stat. 1981, ch. 40, par. 610(b)); made findings sufficiently supporting the order changing custody; and recognized a presumption in favor of the present custodian, the father, or exercised initial discretion in the modification proceedings which rendered the presumption nugatory. The circumstances of this case are somewhat unique; a brief summary is required for a full understanding of its disposition. As revealed in In re Marriage of Sweet (1982), 104 Ill. App. 3d 738, 432 N.E.2d 1098, the mother, Donna, obtained a default divorce from Robert, the father, July 7, 1972, after four years of marriage. Sole custody of Bill, the only child of their marriage, then age 21/2, was awarded to Donna upon stipulation of the parties. No evidentiary hearings with respect to custody or fitness were then held. Each party remarried and other children were born to their new families. In August 1977, Robert, then a career soldier in the United States Army, petitioned for custody of Bill upon the allegation that Donna and her present husband had no permanent place of residence; lived in a variety of different States and locations; interrupted Bill’s lifestyle and disrupted his school attendance. The Cook County Department of Supportive Services’ investigation report noted interviews with Robert, his present wife and his mother, set forth allegations of insufficient food, clothing, discipline, education and supervision while in Donna’s custody; concluded that Robert was a responsible person and found no economic or emotional limitations restricting him from having custody. The report noted that no direct information was available on either the custodial mother or her husband. On December 15, 1977, without making findings with respect to section 610(b) of the Act, the circuit court awarded Robert custody and granted him the right and authority to take physical possession of Bill wherever he might be found. In February of 1978, Robert went to a South Carolina school which Bill attended, presented the principal with a copy of the court order, took Bill from school first to Fayetteville, North Carolina, then to Ft. Sheridan, Illinois, and then to Karlsruhe, West Germany, where Robert was stationed. Approximately one year later, in February of 1979, Donna filed what was then a section 72 petition (now section 2 — 1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2 — 1401)), and moved to vacate the December 15, 1977, order. The circuit court on August 27, 1979, pursuant to Donna’s motion, ordered Robert to bring Bill back to Chicago for visitation. The Cook County Department of Supportive Services conducted a court-ordered medical and psychological examination of Bill on October 3, 1979. On that same day, the court interviewed him in camera. An evidentiary hearing on the section 72 petition was held on November 15, 1979, and the petition was denied by the circuit court. Bill’s visitation with Donna was. continued by order of court, however, until further notice. On February 22, 1980, Donna petitioned for a change of custody. Two evidentiary hearings were thereafter held, the first on March 12, 1981, on an amended petition, and the second on June 15, 1981. A psychiatric report by Dr. June C. Frye, dated January 5, 1980, and filed with the circuit court on October 1, 1980, noted interviews with Donna and Bill. The report referred to a telephone conversation with a member of the Bremen Youth Commission from whom Bill was receiving psychotherapy. Dr. Frye concluded that Bill gave evidence of varied emotional disturbances and that his best interests would be served by allowing him to continue in his present situation with Donna. The report also noted that no interview was attainable with Robert and revealed inadequate information about both. Dr. Frye recommended that psychiatric evaluation of both parents be undertaken in order to determine in whose custody the boy’s interests will best be served. No followup psychiatric evaluation was made, however, and none appeared in the record. On June 23, 1981, the order of December 15, 1977, was vacated and the provisions of the 1972 divorce decree were reinstated with respect to child custody. The circuit court asserted that it was considering the proceedings as a rehearing of the December 15, 1977, change of custody order. Again, no section 610(b) findings were then made. The first appeal proceeded from the June 23,1981, order. After reversal and remand for purposes first above cited, a second circuit judge conducted the present hearings on Donna’s amended petition for change of custody. The hearings culminated in the order granting custody of Bill to Donna, entered May 6, 1983, from which the instant appeal is taken. At the time of these hearings, Bill, now age 13, was living with his mother in Gilman, Illinois. He had lived with her for his entire life except for the 19-month period during which time he lived with his father during the latter’s period of Army service. A new Supportive Services investigation was ordered and a guardian ad litem and attorney was appointed for Bill by the circuit court. A social worker for the Department of Children and Family Services investigated Donna’s home in December 1982 and made two visits there. Donna’s eight-room house had a living room, dining room, kitchen, four bedrooms and a workshop. Bill’s bedroom was shared with his half brother. They slept in bunk beds. The furnishings were adequate. The social worker observed that Bill and his half brother followed their mother’s directions, were appropriately dressed for their age, and were clean. Bill was well adjusted to the home, was part of the family, and was getting along with his siblings, his mother and stepfather. There was no sign of tension between them, but a lot of joking back and forth during which time Bill was polite, well-behaved and articulate for a child of his age. Disrupting his life at this age would be a serious matter, according to the social worker. Through cross-examination, Robert’s attorney established that the social worker did not verify the employment history of Donna’s husband, but she stated it would have no effect on the report she filed. Before they moved to Gilman, Bill had trouble in a Posen, Illinois, school based upon a personality conflict with the teacher, relating to a racial integration problem in the school system there. He is doing well in the Gilman School which he now attends. The social worker found love prevalent in Donna’s home as far as the children and Bill were concerned. Since she did not investigate Robert’s home in North Carolina, she did not know whether there was lack of love in the father’s home for Bill nor anything about conditions there. A similar study was made in North Carolina of Robert’s home; however, the North Carolina investigator did not testify. Donna testified that she has two children by her present marriage, a boy and a girl who live at home with her and her present husband. A 27-year-old man also lives in the home. The latter has his own room, the girl has her own room and Bill and his half brother share a room by their own choosing. At the time of the present hearing, Bill had been living with her for almost three years. He was enrolled in a junior high school in seventh grade, where he was doing well. When Bill was brought back to her 19 months after Robert took custody, the child was skinny, his ribs were showing, he had a swollen belly, sores in his “hair” and scars on his back. At a clinic he was given medication for the sores. She was told that he was experiencing borderline malnutrition which required detailed feeding instructions so that he would not overeat. Donna’s present husband was laid off from work in the past year and has worked only intermittently as a truck driver and at odd jobs. He now has the promise of a job as a truck driver. She sought and received approval for her husband and herself to be foster parents for mentally retarded adults and foster children. Although presently unemployed, she worked for a contractor for almost a year prior to the time Bill was returned to her from Germany. She decided not to work in order to take care of Bill and her other children. She is recovering from personal injuries she received in a recent accident. She presently derives her income from ADC plus food stamps which together amounts to over $700 per month. They rent the house for $100 per month and spend $400 for food, more or less. She is assisted in providing clothing for her children by her sisters; they trade clothes between them according to the needs of the individual children. The last time Bill visited Robert in North Carolina on Christmas, he came home crying about being beaten by his father. Bill told her many times that his father hit him. Robert testified at the present hearing that he lives in Raeford, North Carolina, in a four-room house with his wife and three children. The house has two bedrooms. Bill would sleep in the living room if Robert were granted custody. Robert is studying auto body repair full-time. His present source of income is $114 per month for disability and $501 per month as Veterans Administration compensation while attending school. He received an honorable discharge from the Army and worked as a security guard from October 1980 to January 1981. If granted custody, Bill would sleep in the living room with his half brother. He and his wife occupy one bedroom and his two daughters occupy the second one. The half brother has bad case of asthma-bronchitis. If necessary, he and his wife would give up their bedroom for Bill and his half brother. The house is fairly crowded now. There is no furnace in the house and it is heated with a wood stove. They are seeking other, larger quarters. He last saw Bill on Christmas of 1981 and has not telephoned him. He has written to him but once and has not sent him greeting cards for Christmas or his birthday, and has sent him no presents. Robert denied ever having struck, kicked, slapped or threatened to kill Bill. Bill testified that while living in Germany his father hit, slapped and kicked him. His paternal grandmother switched him with willow branches on his back and on his legs, which was confirmed by Robert’s testimony. His half brothers and sisters were also hit by his father and grandmother in the same manner. His step mother pulled his hair as she did the other children when she wanted something done. While in Germany he slept with his half brother Bobby who, almost every night, would either “poop or pee” in bed. Sheets would not be changed until the end of the week. When he visited his father in North Carolina in August of 1981, Robert struck, slapped and kicked him down 15 or 20 stairs, and again as he was lying on the floor, because he said that Bill had lied in court and that the next time he was there he would kill him. When he visited his father during Christmas vacation of that year, Robert kicked, hit and pushed him and again threatened to kill him. While visiting there, he did not have enough to eat. Although at the hearings following his return to the United States from Germany he stated that he wanted to live with his father in Germany, at the present hearings Bill expressed the desire to live with his mother Donna. He hated his father Robert. Walter Soroka, court-appointed guardian ad litem and attorney for Bill, made a personal investigation of the circumstances surrounding the custodial issue presented here. He talked with Donna, Robert, and both grandmothers. He reviewed the reports of the Illinois Department of Children and Family Services and the North Carolina Department of Social Services and filed his own report with the court. Based upon 30 years of experience in legal practice of matrimonial law, he concluded that it would be detrimental to Bill’s psychological well-being to remove him from Donna’s custody. In talking with Bill at great length, he believed that although Robert is not totally inept, there were some indications of neglect, which included improper clothing and feeding. He also considered the antagonistic attitude Bill has toward Robert. The physical surroundings of the father’s present home are totally wanting, humble, poor and crowded, according to Soroka. Based upon Bill’s testimony, there could be serious questions about his moral well-being if he lived with Robert. He knew of no evidence whereby Bill was told not to see his father or his paternal grandmother. Bill could have been influenced by his present environment or by things he observed while visiting his paternal grandmother during the same period of time in which the mother had custody. He asked Bill about abuse inflicted upon him by his father and paternal grandmother and saw a scar across Bill’s back which Bill said he received from a beating administered by his grandmother. Bill’s toes were curled up, which resulted from the fact that he had shoes which were too tight fitting and small during his stay in Germany. The court in camera stated for the record that physical observation of Bill’s back revealed faded but noticeable marks and scars. Following the hearing, the circuit court made observations and findings, including: “2. That since the petition was filed prior to July 1, 1983, the governing law must be §610(b) prior to its [1982] amendment * * * 3. That *** Billy is presently in the possession and physical control of Donna White Sweet. 4. That the custodian, Robert White, has not agreed to the modification. 5. That although Billy has been integrated into the family of the petitioner, it was without the consent of the custodian. 6. That it would not be beneficial to Billy’s physical, mental, moral or emotional health to disrupt the child’s current living situation for the following reasons: a) That he would be subjected to crowded living conditions in North Carolina. b) That both Mr. White, and his mother admitted the switching of Billy as evidenced by the scars on Bill’s back. c) That Billy expressed a strong desire to live with his mother. d) That Billy is doing well in school and has made many friends near his present home. 7. That it is in the best interests of Billy that his custody be awarded to his natural mother, Donna White Sweet.” By order, the court then awarded permanent care, custody, control and education of Billy to Donna, granting Robert reasonable ■ rights of visitation, and retaining jurisdiction for the purpose of enforcing the judgment. I At the threshold of our consideration of the issues here presented, it should be noted that section 610 of the Act was amended effective July 1, 1982. (Ill. Rev. Stat., 1982 Supp., ch. 40, par. 610(b).) That amendment changed the bases and required findings relative to modification of custody, principally by requiring findings to be based upon clear and convincing evidence and by eliminating the requirement that the child’s present environment be shown to “seriously endanger” his physical, mental, moral or emotional health. The effective date of the amendment thereby fell between the time the opinion in the first appeal herein was filed as modified, March 23, 1982, and the commencement of the first hearings in the circuit court on remand, which began July 30, 1982. Section 801(d) of the Act (Ill. Rev. Stat. 1981, ch. 40, par. 801(d)) provides that “[i]n any action or proceeding in which an appeal was pending or a new trial was ordered prior to the effective date of this Act, the law in effect at the time of the order sustaining the appeal or the new trial governs the appeal, the new trial and any subsequent trial ***.” Although section 801(d) is addressed to the Act itself, in our judgment it should be applied to amendments as well. No case has been cited or found which has applied the foregoing statutory provision to amendments, however an analysis of the policy underlying section 801(d) shows that the purpose of the provision, as suggested by the Commissioner’s Comments to the uniform law from which the provision was adopted, appears to be an effort to allow the correction on appeal or in a new trial of errors made in applying the law in effect at the time of the original hearing pursuant to that law and that changing the rules on appeal or at the new trial would be unfair to the party prejudiced by the error. 9A Uniform Laws Annotated sec. 502, at 219 (1979); see McArdle v. McArdle (1977), 55 Ill. App. 3d 829, 833, 370 N.E.2d 1309, cited with approval in West v. West (1979), 76 Ill. 2d 226, 233, 390 N.E.2d 880. The mandate issued in the first appeal of the instant case required the circuit court to conduct necessary hearings in order to establish a proper basis for the custodial award under section 610(b) of the Act. In this instance, further “hearings” will be treated as equivalent to a new “trial” under section 801(d). (See Fulwider v. Fulwider (1972), 8 Ill. App. 3d 581, 583-84, 290 N.E.2d 264; Doran v. Doran (1972), 7 Ill. App. 3d 614, 616, 287 N.E.2d 731; Ready v. Ready (1961), 33 Ill. App. 2d 145, 159, 178 N.E.2d 650.) Accordingly, the statute to be applied to the facts and circumstances herein presented is section 610(b) as it existed prior to the July 1,1982, amendment.[2] II Robert’s principal contentions in the present appeal are that the circuit court: failed to make necessary findings in order to change custody under section 610(b); neglected to give proper consideration to the presumption in favor of the “present” custodian that the legislature inferentially created in section 610(b) of the Act, citing In re Custody of Harne (1979), 77 Ill. 2d 414, 420-21, 396 N.E.2d 499; and vitiated the presumption by its treatment of the case as one involving an initial consideration of custody issues, rather than a modification thereof. The unusual posture of this case reflects the difficulty with sustaining Robert’s position. Bill had been in custody of his mother for all his 13 years except for the 19 months during which he lived with his father in Germany. The extended visitation rights granted to the mother on September 30, 1979, culminating in the June 23, 1981, order restoring custody to Donna, and Bill’s continuing residence with Donna and her family during this four-year period of time to the present, demonstrates the futility of attempting to wring meaning from statutory language by applying it to circumstances which no longer exist, as in the instant case. Robert is not and has not been the actual “present” custodian for four years. Further, his having been named custodian in the December 15, 1977, change of custody order is under the same cloud of invalidity for lack of section 610(b) findings as the June 23, 1981, order restoring custody to Donna, from which he took the first appeal. Exacerbating the situation is the fact that there never has been an evidentiary basis regarding Bill’s custody even in the original award resulting from the divorce granted on July 7, 1972, which was based solely upon stipulation of the parties rather than evidence. The circuit court in the present hearings well understood the complexity of the foregoing problems in treating the remandment as one which would both adhere to the requisites of section 610(b) and yet admit, of necessity, evidence generally relating to the best interests of Bill with respect to which findings never before had been made. None of the authorities relied upon by Robert addressed circumstances remotely resembling those detailed above, and provide little precedential guidance. Examination of the evidence heard by the circuit court in the remandment proceedings and the court’s findings demonstrate that the policy of stability and continuity in the child’s custodial and environmental relationships were fulfilled (In re Custody of Harne (1979), 77 Ill. 2d 414, 421), through the order of May 6, 1983. The environment to which Bill would be subjected should custody be granted to Robert under the evidence considered by the circuit court on remandment shows that the court was concerned with much more than a mere preference for Donna as custodian or an effort to legitimize the orders of the prior trial judge as argued by Robert. First, Robert’s situation has changed significantly from what it was when custody was granted to him in 1977. For example, his occupation has changed; he is no longer living in Germany; he no longer earns the emoluments formerly available to him; he is a full-time student receiving government aid; and he maintains a considerable difference in living standards than those which existed at the time and prior to the 1977 change of custody order. Second, although Robert appears to be arguing that the absence of the words “endangers seriously” from the written findings of the circuit court renders the balance of the findings a nullity, evidence of “serious endangerment” to Bill was indeed a factor considered during the court’s oral discourse and findings after rhetorically questioning “whether the court must find, collectively, danger to the child’s physical, mental, moral or emotional health, or any one of these singularly.” The court then found, in part, that “both *** [Robert and the paternal grandmother] admitted the grandmother's switching of Billy. In fact *** [Robert] testified that when one switch was broken he would go out and obtain another one. All of this [was] evidenced by the scars on Billy’s back.” Other instances of physical abuse are present in the record, although no findings were made specifically with respect to them. For example, Bill testified that he was struck, slapped and kicked down the stairs, and again as he was lying on the floor, after his return from Germany and while visiting Robert during the summer and again during Christmas vacation of 1981, about which Bill complained to Donna, although denied by Robert. For the foregoing reasons, the judgment of the circuit court awarding custody to Donna with reasonable visitation rights to Robert must be affirmed. On oral argument, Robert’s counsel complained of the circuit court’s declination to establish a visitation schedule. The circuit court has retained jurisdiction to enforce its order and in the event the parties cannot agree to a reasonable visitation schedule between themselves, resort to further court intervention may become necessary. Affirmed. DOWNING, RJ., and PERLIN, J., concur. Although our original opinion cites section 610(b), the printed and published opinion mistakenly refers to section 619(b), which is nonexistent. Section 610(b) has again been amended by Public Act 82 — 1002, effective September 17, 1982, in a manner relating only to modification in cases of joint custody, an issue not involved in the instant case. Ill. Rev. Stat., 1982 Supp., ch. 40, par. 610(b).