# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CT-00088-SCT

*GINGER M. McSWAIN (HARTFIELD)*

*v.*

*CHARLES C. McSWAIN*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 09/16/2003 |
| TRIAL JUDGE: | HON. JAMES H. C. THOMAS, JR. |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM E. ANDREWS, III |
| ATTORNEY FOR APPELLEE: | JAMES R. HAYDEN |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE LAMAR COUNTY CHANCERY COURT IS REINSTATED AND AFFIRMED - 12/14/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     The Lamar County Chancery Court, in a hearing for modification of child custody, held that custody should be transferred from the mother, Ginger M. McSwain Hartfield[1], to the father, Charles C. McSwain.  The Court of Appeals reversed, finding that the chancellor had erred in considering Ginger's past behavior and the possibility of future improvident behavior in determining whether there had been a material change in circumstances that had

---

[1] Ginger has remarried and taken the last name of her husband, Joe Hartfield.

adversely affected their child, Miller McSwain. We hold that there was no abuse of discretion by the chancellor; and therefore, we reverse the judgment of the Court of Appeals and affirm the chancellor's judgment.

## FACTS AND CHANCERY COURT PROCEEDINGS

¶2.     Charles and Ginger McSwain were married in 1997, and Miller was born in October, 1998. The couple filed for an irreconcilable differences divorce in April of 2000 in the Lamar County Chancery Court. In the settlement agreement, they agreed to joint legal custody of Miller with Ginger having primary physical custody.[2] The judgment was final on September 14, 2000.

¶3.     In February 2001, Ginger married Joe Hartfield. The trial evidence shows that the marriage was strained from the beginning. Hartfield and Ginger engaged in arguments and fights that sometimes erupted into physical violence as well.[3] On at least one occasion, the violence rose to such a level that the police had to be called.

¶4.     Hartfield testified that he believed Ginger's actions to be the result of her alcoholism. He also spoke of Ginger's problems with depression and the negative effect that her drinking

---

[2] Although it is a phrase commonly used by lawyers and judges, there is no provision under Miss. Code Ann. Section 93-5-24 for "primary" physical custody. That section sets forth the various combinations of physical and legal custody, but with regard to physical custody, it only provides for joint physical custody, and physical custody in one parent or another. See *Rush v. Rush*, 932 So. 2d 794, 796 (Miss. 2006).

[3] The physical violence included one occasion on which Ginger ripped Mr. Hartfield's shirt off. On another occasion, Ginger drew a knife on him. There was also an occasion where Ginger threw a laptop into the windshield of Mr. Hartfield's car. Miller was forced to witness many of these fights and was upset by them.

had on her medication. On one occasion, Hartfield, frightened by Ginger's actions, left with Miller and took him to the home of Hartfield's mother.

¶5.    In July 2002 Ginger began using cocaine with her neighbor, Ramona. Ginger admitted that by September, she and Ramona were using cocaine frequently. She also admitted that Miller would go with her to Ramona's house when she was using cocaine, but she denied ever using cocaine "in front of him."[4] Ginger did admit to drinking a few times a week in front of Miller.[5]

¶6.    In late September of 2002, Ginger voluntarily admitted herself into the Jolimar Wellness Institute (Jolimar) for drug and alcohol rehabilitation. Ginger, Hartfield, and Charles McSwain agreed privately that Charles would have physical possession of Miller for the duration of Ginger's stay at Jolimar. On October 22, 2002, Ginger completed a 28-day primary care program at Jolimar, and then stayed in an extended care program which she completed on November 22, 2002. However, she attended the weekly aftercare program only until February, 2003, notwithstanding Jolimar's discharge evaluation and aftercare recommendation that she attend aftercare groups for two years.

¶7.    On November 5, 2002, before Ginger had completed her extended care program, Charles filed a petition for modification and emergency hearing without notice in the Lamar County Chancery Court, seeking permanent modification of child custody. On that day, the

---

[4] Ginger said that she would leave Miller in one room while she and Ramona went into the bathroom and smoked the cocaine using a pipe.

[5] Ginger testified that when she would drink in front of Miller, she referred to the alcohol that she was drinking as "hot coffee."

chancellor granted temporary physical custody of Miller to Charles in an ex parte emergency temporary order. On November 13, Ginger moved to set aside the temporary order, and the chancellor modified the temporary order to allow Ginger weekend visitation beginning November 15, 2002.

¶8. Between December 10, 2002, and January 31, 2003, the chancellor entered three additional temporary orders which increased Miller's time with Ginger, on a alternating basis. The trial was set for March 12, 2003, but when a subpoenaed witness failed to appear, the matter was continued. Once again, the chancellor entered a temporary order regarding Miller, which alternated his physical possession between Charles and Ginger on a weekly basis until the date of trial.

¶9. The trial took place August 25 and 26, 2003. Final judgment was issued September 16, 2003, continuing joint legal custody, but transferring physical custody of Miller from Ginger to Charles, and granting "every reasonable visitation" to Ginger, albeit within a specific schedule. In support of his decision, the chancellor cited that Ginger is an admitted drug and alcohol addict who is currently on medication for depression. The chancellor found that Ginger has had suicidal thoughts and suffers from the usual negative feelings that accompany drug and alcohol abuse. It was also found that there is still friction between Ginger and Hartfield in their marriage. Ginger's continued association with Ramona, the neighbor who had supplied Ginger with cocaine, was of particular concern to the chancellor.

¶10. The judgment also reflected the chancellor's concerns that Ginger had not attended the suggested aftercare for her rehabilitation. Ginger's counselor at Jolimar testified that he

4

believed Ginger would seek help if she lost control of her actions. The chancellor stated that Ginger's past inability to control her actions would not make for a good circumstance for a child dependant on Ginger making important decisions.

¶11. Although it was recognized that Charles had been married four times and used alcohol regularly,[6] the chancellor found that Charles had a more stable home environment. To support this position, the chancellor pointed out that Charles worked from his home, had a comfortable income and was currently in a stable marriage.

¶12. With these findings, the chancellor determined that there had been a material change in circumstances which had an adverse impact on Miller. The chancellor then tracked the factors set forth in *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983), as he evaluated the facts and circumstances to determine whether it was in Miller's best interest to remain in the custody of his mother, or whether it would be best for Miller to be in his father's custody. The chancellor then awarded custody of Miller to Charles McSwain, giving Ginger reasonable visitation rights.

## PROCEEDINGS IN THE COURT OF APPEALS

¶13. On direct appeal, the Court of Appeals reversed and rendered with respect to the chancellor's decision to modify custody of Miller, holding that the chancellor had abused his discretion by "focus[ing] on the potential for future problems rather than the presently-

---

[6] His undisputed testimony was that he does drink occasionally, and that in the past year he may have bought "three or four cases of beer, so one, two beers a week."

5

existing circumstances of Miller's home life." ***McSwain v. McSwain***, 2005 Miss. App. LEXIS 833 at ¶13 (Miss. Ct. App. 2005).

## ANALYSIS

### I. Standard of Review

¶14. This Court laid out the standard for reviewing a chancellor's decision in a child custody case in ***Mabus v. Mabus***, 847 So. 2d 815 (Miss. 2003). "In a case disputing child custody, the chancellor's findings will not be reversed unless manifestly wrong, clearly erroneous, or the proper legal standard was not applied." ***Id.*** at 818.

### II. Evidence of material change in circumstances

¶15. In a modification proceeding, the burden is on the non-custodial parent to prove by a preponderance of the evidence: "(1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interests mandate a change of custody." ***Id.*** (citing ***Bubac v. Boston***, 600 So. 2d 951, 955 (Miss. 1992)).

¶16. The crux of the Court of Appeals' analysis was that the material changes in circumstances in Miller's home life that would have an adverse affect on Miller were not continuous and no longer existed at the time of the trial. "[T]he chancellor should find that the overall circumstances in which a child lives have materially changed *and are likely to remain materially changed for the foreseeable future*." ***McSwain***, 2005 WL 2979678 at ¶ 12 (quoting ***Tucker v. Tucker***, 453 So. 2d 1294, 1297 (Miss. 1984)) (emphasis in original). The Court of Appeals stated that the chancellor abused his discretion because he focused on

6

the potential for future problems rather than presently-existing circumstances and, because Ginger was drug and alcohol free at the time of the hearing, the material change in circumstances was not contemporaneous and could not mandate a change of custody. *Id.* at ¶13. The Court of Appeals went on to say that it appeared "that the chancellor mistakenly used past misconduct on Ginger's part to trigger a re-weighing of the *Albright* factors." *Id.* at ¶15.

¶17. This Court recently dealt with a very similar case in ***Johnson v. Gray***, 859 So. 2d 1006 (Miss. 2003), where a mother (Johnson) appealed a chancellor's order that custody of her child be transferred from her to her ex-husband, the child's natural father (Gray). Johnson was an alcoholic, had at least one car accident where she was driving under the influence of alcohol, and even had an incident where she got into a fight with her boyfriend and knocked a window out of his truck. *Id.* at 1008-09. However, as in the case presently before the Court, Johnson sought treatment from a rehabilitation facility and was released prior the custody hearing in her case, and she was attending aftercare twice every week. *Id.* at 1014-15. She had also married, started attending church, and was building a home before the hearing. *Id.* Under the Court of Appeals' reasoning, Johnson should have retained custody of her child. However, this Court upheld the chancellor's decision to transfer custody from Johnson to Gray, stating that "hardly enough time" had passed "to determine if [Johnson] [would] be able to remain sober." *Id.* at 1015. This Court upheld the chancellor's decision to use the possibility of a future relapse as a factor weighing against Johnson.

7

¶18. Here, the chancellor cited numerous reasons for his decision to modify custody of Miller. The factors considered included Ginger's depression and the fact that she had suicidal thoughts. Ginger's drug and alcohol addiction, her failure to attend aftercare, and the fact that Ginger still associates with her former drug partner also weighed heavily in the chancellor's decision.

¶19. The Court of Appeals held that because Ginger was not using drugs or alcohol at the time of the hearing, Ginger's addiction could not be considered a continuing change in circumstance. However, by Ginger's own admission on the witness stand, she will always be an addict, and, as the chancellor mentioned in his judgment, she continues to suffer from the negative feelings that accompany an addiction. Ginger's drug addiction transpired after the custody arrangement to which she and Charles agreed was incorporated into their irreconcilable differences divorce decree. It is most certainly a material change that adversely affects Miller, and because her drug addiction is something that Ginger will likely have to endure for years, if not the rest of her life, it continues. Ginger's drug addiction satisfies the first two prongs of the test for modification of child custody.

¶20. Also cited by the chancellor was the discord in Ginger's marriage with Joe Hartfield. The Court of Appeals stated that because the tension between Hartfield and Ginger at the time of trial "was not as fierce and contentious as it had previously been," that the circumstances that might have mandated a change in custody had subsided. *McSwain*, 2005 WL 2979678 at ¶17. As discussed earlier, the fights that took place between Hartfield and

8

Ginger were often extremely heated and very violent. These types of fights constituted a material change in circumstances that would adversely affect Miller.

¶21. Taken in the aggregate, the factors considered by the chancellor obviously constitute sufficient circumstances to warrant a change in custody would be in Miller's best interests. The chancellor thoroughly examined the evidence and made a finding of fact using the *Albright* factors. He determined that Miller's best interests would be served by a modification of the original custody agreement, and awarded custody of Miller to Charles McSwain. We find no error in this regard.

### III. Modification of custody

¶22. This Court has been very clear about the amount of deference that chancellors are to receive in making a factual determination. "[W]e, as an appellate court, will affirm the decree if the record shows any ground upon which the decision my be justified ...We will not arbitrarily substitute our judgment for that of the chancellor who is in the best position to evaluate all factors relating to the best interest of the child." *Tucker*, 453 So. 2d at 1296 (quoting *Yates v. Yates*, 284 So. 2d 46, 47 (Miss. 1973)). In the present case, there was sufficient evidence for the chancellor to find that a change of custody was in Miller's best interest. A review of the record and the judgment reveals no manifest wrong, clear error, or improper legal analysis, and the ruling of the chancellor was reasonable under the facts.

### CONCLUSION

¶23. Chancellors are in the best position to make a determination based on the facts presented to them at trial. In this case, the chancellor stated that Ginger was a good mother

9

who made a bad choice. Unfortunately, the choices that Ginger made will affect her and her family for a very long time. The chancellor weighed the facts in this case and made a ruling based on those facts, and this Court will not second guess that ruling. Therefore, the judgment of the Court of Appeals is reversed, and the judgment of the Lamar County Chancery Court is affirmed.

¶24. **THE JUDGMENT OF THE COURT OF APPEALS IS REVERSED. THE JUDGMENT OF THE CHANCERY COURT OF LAMAR COUNTY IS REINSTATED AND AFFIRMED.**

**SMITH, C.J., WALLER, P.J., DIAZ, EASLEY, CARLSON, DICKINSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**