# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CT-01592-SCT

*RACHEL DRISKELL PORTER (SPIVEY)*

*v.*

*TIMOTHY WADE PORTER*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 07/11/2006 |
| TRIAL JUDGE: | HON. WILLIAM JOSEPH LUTZ |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | RICHARD C. ROBERTS |
| ATTORNEYS FOR APPELLEE: | WILLIAM R. WRIGHT |
| | TRHESA BARKSDALE PATTERSON |
| | DEBORAH H. BELL |
| | W. BENTON GREGG |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED AND REMANDED IN PART - 12/03/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     Rachel Driskell Porter Spivey ("Rachel") and Timothy Wade Porter ("Tim") were divorced in October 2000. Incorporated into the divorce decree was a "Child Custody, Child Support and Property Settlement Agreement" ("Agreement") providing for joint physical and legal custody of their three minor children ("Porter children"). In December 2005, Rachel's husband, Dan Spivey ("Dan"), received and accepted a job offer in Memphis, Tennessee. Thereafter, Rachel petitioned the Chancery Court of Madison County, Mississippi, for a

revision of the "current custodial arrangement," praying for the Porter children to live primarily in Memphis with her and Dan. Tim answered and counter-petitioned, seeking sole physical custody of the Porter children in Jackson, with "an appropriate visitation schedule . . . for Rachel . . . ." The chancery court determined that Rachel's move to Memphis would render the Agreement impractical and undertook an *Albright*[1] analysis. After weighing the *Albright* factors, the chancery court concluded that the children's "best interest would be served by granting [Tim] sole physical custody with Rachel having liberal rights of visitation. The parties shall continue to share joint legal custody[,]" and entered a judgment in accord.

¶2. After the judgment was entered, Dan was terminated from his employment in Memphis. Rachel then filed a "Motion for Relief from Judgment," asserting that because of Dan's termination, she would remain in Jackson, and sought reinstatement of the original Agreement. After the chancery court denied Rachel's motion, she filed appealed. The Mississippi Court of Appeals affirmed the grant of sole physical custody to Tim, but reversed and remanded for a modification of Rachel's visitation schedule, which was based upon her living in Memphis. *See Porter (Spivey) v. Porter*, 2008 WL 4559737, at *3 (Miss. Ct. App. Oct. 14, 2008). Following the Court of Appeals' denial of Rachel's motion for rehearing, this Court granted her "Petition for Writ of Certiorari."

---

[1] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983) (outlining the relevant factors to be considered in child custody determinations).

**FACTS**

¶3. On October 4, 2000, Rachel and Tim were granted a divorce based upon irreconcilable differences, with the Agreement incorporated therein. The Agreement notably provided that "[t]he parties shall have joint physical custody[2] with Wife awarded primary physical custody of the [three] minor children; Husband shall have secondary physical custody of the minor children; the parties shall have joint legal custody[3] of the minor children." As to "joint physical custody," the Agreement was modified in May 2003 to read:

> Alternating weekends commencing Friday at 12:00 noon or time school is dismissed and ending at 5:00 p.m. on Sunday.
>
> . . .
>
> Each and every week, Tim shall have custody . . . commencing on Wednesday from the time school is dismissed and ending with Tim taking the children to school on Friday morning.
>
> . . .
>
> When school is not in session, Tim shall have custody of the children commencing at 12:00 noon on Wednesday and ending at 12:00 noon on Friday.
>
> . . .

---

[2]The Agreement reads "[j]oint physical custody means that each of the parents shall have significant periods of physical custody and it shall be shared by the parents in such a way so as to assure a child a frequent and continuing contact with both parents." This is a nearly verbatim recitation of Mississippi Code Section 93-5-24(5)(c) (Rev. 2004).

[3]The Agreement reads "[j]oint legal custody means that the parents share the decision-making rights, the responsibilities and the authority relating to the health, education and welfare of the children and obligates the parties to exchange information concerning the health, education and welfare of the minor children and to confer with one another in the exercise of decision-making rights, responsibilities and authority." This is a nearly verbatim recitation of Mississippi Code Section 93-5-24(5)(e) (Rev. 2004).

> [Tim] shall be entitled to two (2) additional overnight periods, excluding the Mondays following [his] custodial weekend, during the month to be selected by him during the same hours . . . .[4]

The Agreement further stated that "[i]n the event either part[y] moves from the Jackson Metropolitan area, that event shall constitute a material change in circumstances."[5] Regarding child support, the Agreement provided that Tim "shall pay to [Rachel] for the support and maintenance of the minor children . . . the sum of [$2,550] per month ($850 per month per child) . . . until the respective child is emancipated."

¶4.    On April 21, 2001, Rachel married Dan.  Two children were born of their marriage. In November 2004, Tim married Samantha Thomas Porter ("Samantha").  The couple has no children together, but Samantha has a daughter from a previous marriage.

¶5.    In December 2005, Dan received a job offer from Wellspring Management, LLC ("Wellspring"), a hedge fund founded in October 2004 and based in Memphis, Tennessee. According to George White, the managing member of Wellspring, the employment offered to Dan was "terminable-at-will," and his employment contract guaranteed him no severance benefits.  According to White, "the only other stipulation . . . that wasn't up for negotiation

---

[4]Additionally, holiday visitation was split equally between Tim and Rachel, and each parent had "the children for three (3) uninterrupted weeks during the summer vacation period."

[5]Such a provision, standing alone, is not binding upon the courts.  "This Court has repeatedly held that relocation of a parent does not necessarily result in a material change in circumstances."  *Lackey v. Fuller*, 755 So. 2d 1083, 1088 (Miss. 2000).  First, the chancellor must determine if relocation is, in fact, a "material change in circumstances," when considering the totality of circumstances.  If proven to be so, then the chancellor must determine whether the change in circumstances adversely effects the children.  If the answer is in the affirmative, it is incumbent upon the chancellor to conduct an *Albright* analysis. *See* Issue I *infra*.

4

was [Dan] had to move to Memphis." Dan accepted Wellspring's offer and, in early January 2006, commenced his employment.

¶6. On January 6, 2006, Rachel submitted admission applications for the 2006-2007 school year to Memphis schools on behalf of the Porter children. On the applications, Tim was not mentioned. Dan was listed as the "Father/Guardian" or "[Step]Father." On January 21, 2006, Rachel informed the children of their impending move to Memphis. The following day, Rachel called Tim and informed him of the imminent move. On January 25, 2006, Tim filed an "Emergency Motion for Temporary Restraining Order and/or Alternative Injunctive Relief," seeking, *inter alia*, to force Rachel to "[r]efrain from taking the children to Memphis to become involved in community activities such as church or school . . . ."

¶7. On February 28, 2006, Rachel filed a "Petition to Modify Defendant's Periods of Physical Custody." The petition provided that "[a]s a result of the change in Dan's employment status, Rachel and her five (5) children are planning to move to Memphis after the current school session." The petition added that Rachel "does not seek a change in the current custodial arrangement whereby the parties have joint physical custody with Rachel being the primary physical custodian and Tim being the secondary physical custodian. Rachel seeks only a revision of the custodial periods set forth in the parties' Agreement."

¶8. At a subsequent hearing, the chancellor granted Tim's "Emergency Motion for Temporary Restraining Order and/or Alternative Injunctive Relief," stating that, "I don't see any reason to get these children involved in community activities in Memphis right now

when their primary focus, at the very least until the end of this school year,[6] is right here in middle Mississippi."

¶9.  The chancery court subsequently entered an order appointing Debra L. Allen as guardian ad litem.  Her role was to "advis[e] the Court in determining the best interests of the children."  To that end, Allen was provided with "full access to all documents, things, and witnesses, including the parties, relevant to issues before the Court . . . ."

¶10.  Tim answered Rachel's petition and counter-petitioned for modification of physical custody.  Tim's counter-petition averred:

> Rachel's move is indeed a material change in circumstance for the children . . . .  Further, the children are immersed in extracurricular and church activities within their community.  A relocation with Rachel would be detrimental for the children, as it would necessitate changing schools, and would include a general upheaval in the children's lives. . . .
>
> It is in the children's best interests to remain in their home and community in the Jackson, Mississippi area.

Tim sought sole physical custody and the establishment of "an appropriate visitation schedule with the children for Rachel . . . ."

¶11.  Following the examination of witnesses by both parties at trial, Allen provided a guardian ad litem statement.  According to Allen, "[t]hese children have lead [sic] as best of a post-divorce life as any three children could have."  She added that "[t]he Court has heard about the children's school records.  It's admirable. . . . [T]hey are all doing great.  They all

---

[6]The chancellor earlier had noted that "there is a misconception, perhaps, Rachel, on your part.  Don't presume that these children are going to be moving to Memphis. . . . [T]his is a joint custody, unless your lawyers can convince me otherwise."  He then added that "I have never gone through . . . an *Albright* [a]nalysis to determine what is in the children's best interest.  *That is what I will be doing in this case*."  (Emphasis added.)

6

attend church. They're all friendly, warm, open children and they have lots of friends, family. It's all there." Based upon Rachel's move to Memphis, Allen opined that "it's going to be impossible for them to live in the way that they did." Allen determined that the "geographical move is going to make this current arrangement likely not workable, without some changes, I think an *Albright* analysis is appropriate." Allen concluded that:

> [o]n the continuity of care issue, that is going to weigh slightly on [Rachel's] side of this issue. She is extremely organized. She has multiple children in her household and she takes great steps to . . . pay attention, give attention to and schedule their various needs. That is not an easy task. And I believe that she is primarily the one who has done that.

Because the Porter children are now "going to have to live some place where they're going back and forth" and "somebody is going to have to help them organize that existence[,]" Allen felt that Rachel "is better at doing such things." Additionally, Allen noted that:

> if they stayed here [in Jackson] and then they leave here and they go off to visit their mom, they're going to a world where they don't know anything. And they're not going to have friends and they're not going to have family and it is not going to be . . . as good for them. If they live with their mom and they come back here, here is family. Here is home that they remember. Here are familiar surroundings. Here is friends, kids to play with. And so it makes the notion of leaving home to another home . . . more palatable.

Allen recommended that the Porter children primarily live in Memphis with Rachel and Dan.

¶12. The July 11, 2006, opinion of the chancery court initially concluded that the Agreement expressly provided for joint legal and physical custody, and that the parties' "actions over the past five (5) years" were consistent with that. The chancery court then found that "Rachel's move to the State of Tennessee has made the present joint physical and

7

legal custody arrangement *impractical*[7] and as such constitutes a *material change in circumstances adverse to the children's best interest*."  (Emphasis added.)

¶13.    The chancellor then conducted an ***Albright*** analysis and found that four factors favored Tim.  Regarding "parenting skills," the court noted that "[b]oth Rachel and Tim are exceptional parents.  They have different parenting styles which has only made the current joint custody arrangement that much more unique.  These children have enjoyed the best of both parenting styles."  Nonetheless, this factor was found to favor Tim based upon Dan's use of corporal punishment with the Porter children; Dan's self-proclaimed status as the "head of household" to whom the family "is expected to be subservient[;]" Dan's tendency "to undermine Tim's role as the children's father[,]" which Rachel "does little, if anything, to deter[;]" and Dan's intense demeanor, which "can cause fear in others . . . ."[8]  As to the "home, school and community record of the children," the court found that this factor "strongly favor[ed]" Tim, as the children grew up in the Jackson area, excelled in their school environment at First Presbyterian Day School, had strong community ties in the Jackson area, and had extended family living near Jackson.  By contrast:

> [i]n Memphis, the children have no home, school or community record.  The children have never lived in Memphis. . . .  The children have no extended family in Memphis. . . .  The children will be required to attend a new church in Memphis. . . .  The children will be enrolled in new private schools in Memphis . . . .  The children have never been involved in social or sporting activities in Memphis . . . .

---

[7]Elsewhere, the chancery court found that "Tim and Rachel's present shared custody arrangement between parents of school age children will be *impractical, if not impossible to maintain* with the parties living in two different states."  (Emphasis added.)

[8]By contrast, the court found that Samantha "has remained as neutral as possible."

Regarding the "stability of the home environment and employment of the parent," the court found that this factor favored Tim because of Dan's intense demeanor, which "can cause fear in the children[,]" and Dan's "terminable-at-will" contract with a "company/entity . . . which . . . is only two (2) years old." Conversely, Tim's employment stability was demonstrated by his successful legal practice. Finally, in considering "other factors relevant to the parent-child relationship," the court found that Tim was favored. The chancellor stated that "Rachel and Tim co-parent beautifully[,]" adding that "[t]his is one of the rare occasions where, until now, the children have felt little impact from the divorce." However, the chancellor opined further that "[d]ue to Rachel's move, this is no longer a privilege that these children will enjoy. . . . [T]here is no equivalent substitute to having both parents available twenty-four (24) hours a day. And that is what the Porter children have enjoyed thus far." Therefore, given the impossibility of recreating that nurturing context with Rachel in Memphis, the chancellor rhetorically asked, "[w]on't the adjustment of losing one full-time parent be easier surrounded by the security of constants [the Porter children] have grown-up among as part of their everyday lives?" By contrast, the lone *Albright* factor which the court deemed to even "minimally favor" Rachel pertained to "physical and mental health." In total, the chancery court concluded that the children's "best interest would be served by granting [Tim] *sole physical custody* with Rachel having liberal rights of visitation. The parties shall continue to share joint legal custody." (Emphasis added.)

¶14.     Additionally, the opinion provided that "[p]ursuant to Mississippi Code Annotated § 43-19-101, there is a rebuttable presumption that child support for three (3) children is twenty-two percent (22%) of the non-custodial parents adjusted gross income. Rachel shall

9

pay to Tim, twenty-two percent (22%) of her adjusted gross income as child support." The opinion further added that:

> [i]n lieu of the aforementioned monthly child support payments, Rachel shall pay one-half (½) of the children's expenses at a private school from elementary school through high school to include registration fees, tuition and books. Tim is hereby relieved of his obligation to pay Rachel child support of $2,550 per month.

On July 11, 2006, the court issued its "Final Judgment."[9]

¶15. On July 21, 2006, Rachel filed a "Motion for a New Trial and/or to Amend or Alter Final Judgment." On August 4, 2006, Rachel filed a "Motion to Stay Operation of Final Judgment," asserting that:

> [a]lthough Rachel and . . . Dan have completed the purchase of a home in Memphis, Tennessee, and have contracted to sell their home in Jackson, Mississippi, Rachel has made and is making arrangements to temporarily remain in Jackson so that she can continue to provide the full-time parenting of her children which this Court described in its Opinion as a "blessing" and a "privilege" for the children. Rachel intends to remain in Jackson until such time that she secures a favorable ruling on her Motion for New Trial and/or to Alter or Amend Judgment, or until her appeal is decided on the merits.

Rachel requested that the chancery court "enter its order staying the operation of the . . . Final Judgment for so long as [Rachel] remains in Jackson, Mississippi, and to permit all provisions of the prior [Agreement] . . . to remain in full force and effect." Both of Rachel's motions were denied.

¶16. On August 8, 2006, Dan was terminated from his position at Wellspring. On August 30, 2006, Rachel filed a "Motion for Relief from Judgment," pursuant to Mississippi Rule of Civil Procedure 60(b)(5) and (6), stating that "as a result of Dan's termination, Rachel will

---

[9]Visitation schedule modifications were made in the "Final Judgment."

not be leaving Jackson at all. Dan and Rachel will continue to reside in their home in Jackson . . . ." Rachel asserted that because "[t]he [c]ourt's analysis of the *Albright* factors, and the subsequent decision to modify physical custody, was occasioned solely by Rachel's anticipated move to Memphis as a result of Dan's employment[,]" and because "Dan's termination has made the potential change in circumstances, and the potential adverse effect occasioned by a move to Memphis, moot[,]" then the original custody arrangement "is not only practical, but also in the children's best interest."

¶17. At the hearing on Rachel's "Motion for Relief from Judgment," the chancellor admitted that he had "based the entire judgment on the fact that Rachel and Dan and their family were moving to Memphis." Nonetheless, the chancellor stated that "what happened to [Dan] was totally foreseeable." Indeed, the chancellor's *Albright* analysis, expressing concern regarding Dan's terminable-at-will contract, was prophetic. The chancellor added further that, based upon their "demonstrated performance," it is equally "foreseeable" that Dan and Rachel will again move in response to another job offer. As such, the chancellor denied Rachel's motion, stating that "[o]nce the evidence was all in, I was convinced that these children staying here with Tim was the best thing for them." Furthermore, in the chancellor's estimation:

> the reason that the prior [Agreement] worked so well was that Tim and Rachel, at least where the kids were concerned . . . were focused on the same thing. . . . [T]he impression I get, that is not necessarily the case now and that is the only way that something like that [i.e., returning to the original Agreement] would work.

11

The chancellor added that "if I'm wrong and they are getting along well, then I would anticipate that what [Rachel is] asking for will happen. So, you don't need an order from me."[10]

¶18.   On September 14, 2006, the court entered an order denying Rachel's "Motion for Relief from Judgment." On September 15, 2006, Rachel filed a notice of appeal.

### MISSISSIPPI COURT OF APPEALS PROCEEDINGS

¶19.   Regarding child custody, the Mississippi Court of Appeals:

> reject[ed] a blanket ban on all modifications based on anticipated adverse material change. We find that the chancellor should have conducted an *Albright* analysis after the Rule 60(b) motion was filed to reevaluate the factors in light of [Rachel's] change in circumstances. However, we recognize that the decision was within the chancellor's discretion and find this error to be harmless.

*Porter*, 2008 WL 4559737, at *2. Therefore, the Court of Appeals "affirm[ed] the chancery court's judgment granting sole physical custody to Tim." *Id*. at *3. Regarding visitation, however, the Court of Appeals found that "[b]ecause Rachel's anticipated move to Memphis never occurred, the visitation schedule dividing the children's time between Jackson and Memphis must be modified. We, therefore, reverse and remand this matter to the chancery court for resolution of Rachel's visitation rights."[11]  *Id*.

---

[10]According to the chancellor, "if Tim wants to do something that he thinks would be in the best interests of the children my impression is that he has always done those things."

[11]The Court of Appeals also affirmed the chancery court's denial of Rachel's "Motion for Recusal of the Judges in Chancery Court District 11." *See id*. According to the Court of Appeals, "Judge Lutz believed that he had the ability to act fairly and impartially in matters related to this case, and there is nothing in the record to indicate that he did any differently. Accordingly, we find no error with his decision not to recuse himself." *Id*.

¶20. Following the Court of Appeals' denial of Rachel's motion for rehearing, this Court granted her "Petition for Writ of Certiorari."

## ISSUES

¶21. This Court will consider:[12]

(1) Whether the chancellor utilized and applied incorrect legal standards in modifying the Agreement.
(2) Whether the chancellor erred in rejecting the guardian ad litem's custody recommendation.
(3) Whether the chancellor erred in modifying child support.
(4) Whether the chancellor abused his discretion in denying Rachel's "Motion for Relief from Judgment."

## ANALYSIS

**I. Whether the chancellor utilized and applied incorrect legal standards in modifying the Agreement.**

¶22. The original Agreement provided that "[t]he parties shall have *joint physical custody* with Wife awarded *primary physical custody* of the [three] minor children; Husband shall have *secondary physical custody* of the minor children; the parties shall have *joint legal custody* of the minor children." (Emphasis added.) Mississippi Code Annotated Section 93-5-24(1) outlines the statutorily permissible forms of child custody. *See* Miss. Code Ann. § 93-5-24(1) (Rev. 2004). For example, Mississippi Code Section 93-5-24(1)(a) provides for "[p]hysical and legal custody to both parents jointly[,]" while Section 93-5-24(1)(c) provides for "[l]egal custody to both parents jointly . . . and physical custody to either parent." Miss.

---

[12]Mississippi Rule of Appellate Procedure 17(h) provides that "[t]he Supreme Court may limit the question on review." Miss. R. App. P. 17(h). As such, regarding the issue of whether the chancellor erred in denying Rachel's motion for recusal, this Court finds there was "no error with [Judge Lutz's] decision not to recuse himself." *Porter*, 2008 WL 4559737, at *3.

Code Ann. § 93-5-24(1)(a) & (c) (Rev. 2004). The statute, however, makes no mention of either "primary" or "secondary" physical custody. "Although it is a phrase commonly used by lawyers and judges, there is actually no provision under the statute for 'primary' physical custody." ***Rush v. Rush***, 932 So. 2d 794, 796 (Miss. 2006). *See also **McSwain v. McSwain***, 943 So. 2d 1288, 1290 n.2 (Miss. 2006). Therefore, since the Agreement provided for "joint physical custody," defined in the Agreement as in Mississippi Code Section 93-5-24(5)(c),[13] this Court finds that the phrases "primary physical custody" and "secondary physical custody," undefined in the Agreement, cannot act to transform such express "joint physical custody" into *de facto* sole physical custody with liberal visitation. Under the Agreement, Rachel and Tim exercised joint physical and legal custody.

¶23. Mississippi Code Section 93-5-24(6) provides that "[a]ny order for joint custody[14] may be modified or terminated upon the petition of both parents or upon the petition of one (1) parent showing that a material change in circumstances has occurred." Miss. Code Ann. § 93-5-24(6) (Rev. 2004). However, in joint custody cases, this Court has stated that "[i]n order to modify child custody, it must be proven that a material change in circumstances has occurred that adversely affects the welfare of the child . . . ." ***Lackey***, 755 So. 2d at 1088. *See also **Elliott v. Elliott***, 877 So. 2d 450, 454 (Miss. Ct. App. 2004); ***Rinehart v. Barnes***, 819 So. 2d 564, 566 (Miss. Ct. App. 2002). Any suggested conflict between the statute, which is silent as to requiring adverse effect on the welfare of the child, and the caselaw is,

---

[13]*See* footnote 2 *supra*.

[14]The statutory definition of "joint custody" is "joint physical and legal custody." Miss. Code Ann. § 93-5-24(5)(a) (Rev. 2004).

14

in practice, not a conflict. The statute addresses the content of the petition, while the caselaw addresses the requisite proof for modification.

¶24.    At trial, both Rachel and Dan testified that Rachel's anticipated move to Memphis was certain regardless of the court's decision. In applying the "material change in circumstances which adversely affects the children's welfare" standard in the joint-custody context, this Court previously has stated that an *Albright* analysis is proper when "it would be impractical to leave custody as it stood at the time of the hearing." *Lackey*, 755 So. 2d at 1089 (adding that "[i]ts surely in the children's best interest NOT to be shuttled back and forth between New York and Mississippi every two weeks."). *See also Franklin v. Winter*, 936 So. 2d 429, 432 (Miss. Ct. App. 2006) ("[a]ccording to recent cases, the moving of one party some distance away can constitute a material change in circumstances sufficient to warrant the modification of a custody agreement when the parties at issue share joint physical custody of the child . . . ."); *Elliott*, 877 So. 2d at 455 ("[t]here are cases . . . which state that the moving of one party is sufficient grounds for modification because it makes joint custody impractical or impossible."); *Rinehart*, 819 So. 2d at 566 (affirming modification based on *Albright* analysis predicated upon the chancellor finding that "the shared custody agreement between parents of a child of school age, living in two different states, would be quite difficult to maintain"); *Massey v. Huggins*, 799 So. 2d 902, 906 (Miss. Ct. App. 2001) (affirming modification based on *Albright* analysis predicated upon the chancellor finding that "the impracticality of the present joint physical custody arrangement was a material change in circumstances adverse to the children's best interests . . ."). The court applied the impractical/impossible analysis in the case sub judice, finding that "Rachel's move to the

15

State of Tennessee has made the present joint physical and legal custody arrangement *impractical* and as such *constitutes a material change in circumstances adverse to the children's best interest.*" (Emphasis added.)

¶25. On this point, the separate opinion of Chief Justice Waller suggests that "the chancellor erred in granting a custody modification based on a material change in circumstances that had not yet occurred." This despite the fact that we have previously found, as have other states,[15] no error in pre-move petitions and orders to modify custody in both sole and joint custody contexts. *See Lackey*, 755 So. 2d at 1088 (involving a "*pending move*" to New York) (emphasis added); *Spain v. Holland*, 483 So. 2d 318, 318 (addressing the issue of "[s]hould the chancery courts of this state interfere with a divorced custodial parent's *planned movement* of minor children to a foreign nation incident to that parent's pursuit of a reasonable professional or economic opportunity?") (emphasis added). Both *Lackey* and *Spain* predated the latest amendments to Mississippi Code Section 93-5-24. Therefore, even assuming *arguendo* that this Court's prior permission of custody modifications based upon not-yet-effectuated material changes in circumstances was incorrect, the following analysis from *Caves v. Yarbrough*, 991 So. 2d 142 (Miss. 2008), is applicable:

---

[15]*See In re Marriage of Nodot*, 401 N.E.2d 1189, 1194 (Ill. App. Ct. 1980) (affirming transfer of custody of minor child from mother to father based, in part, on mother's "planned move to Jakarta[, Indonesia] . . . ."); *Brown v. Brown*, 621 N.W.2d 70 (Neb. 2000) (involving pre-move petition by joint custodial mother seeking sole legal and physical custody of children should she move from Nebraska to New York); *McGuinness v. McGuinness*, 970 P.2d 1074 (Nev. 1998) (involving pre-move petition to relocate by a mother with joint physical and legal custody).

in cases where this Court concludes a statute was incorrectly interpreted in a previous case – we will nevertheless continue to apply the previous interpretation, pursuant to the doctrine of *stare decisis*, upon finding the Legislature amended or reenacted the statute without correcting the prior interpretation. In our view, such action on the part of the Legislature amounts to incorporation of our previous interpretation into the reenacted or amended statute. The Legislature is, of course, free to preclude our incorrect interpretation by specific provision, failing which, we must conclude that the legislative silence amounts to acquiescence. Stated another way, the incorrect interpretation becomes a correct interpretation because of the Legislature's tacit adoption of the prior interpretation into the amended or reenacted statute.

*Id*. at 153-54. Thus, this Court concludes that the Court of Appeals wisely "reject[ed] a blanket ban on all modifications based on anticipated adverse material change[,]" reasoning that, to hold otherwise, "Tim would have been obliged to wait until Rachel moved with the children to Memphis before filing for modification. Under our current system, Rachel would then have been required to return to Jackson to respond and defend." *Porter*, 2008 WL 4559737, at *2.

¶26. As the impractical/impossible standard was satisfied, the chancery court then conducted an *Albright* analysis. The chancery court determined that four *Albright* factors favored Tim, one *Albright* factor "minimally favor[ed]" Rachel, and the children's "best interest would be served by granting [Tim] sole physical custody with Rachel having liberal rights of visitation." "Findings of fact made by a chancellor simply may not be set aside or disturbed on appeal unless manifestly wrong." *Spain v. Holland*, 483 So. 2d 318, 320 (Miss. 1986). "[W]e, as an appellate court, will affirm the decree if the record shows any ground upon which the decision may be justified . . . ." *McSwain*, 943 So. 2d at 1293 (quoting *Tucker v. Tucker*, 453 So. 2d 1294, 1296 (Miss. 1984)). Given the evidence presented, this Court cannot conclude that, in his *Albright* analysis, the chancellor "abused his discretion,

17

was manifestly wrong, clearly erroneous or applied an erroneous legal standard." ***Morgan v. West***, 812 So. 2d 987, 990 (Miss. 2002) (quoting ***Cummings v. Benderman***, 681 So. 2d 97, 100 (Miss. 1996)). Accordingly, we affirm the chancellor as to this issue.

> **II.     Whether the chancellor erred in rejecting the guardian ad litem's custody recommendation.**

¶27.    The chancellor voluntarily appointed Allen as guardian ad litem in this case. Both prior to and during trial, the chancellor lauded Allen. He referred to her as "our star witness" and the "best witness" regarding "what these children have to say and what they feel about parents and stepparents." He further stated that, "I'm going to get . . . most of my impressions about what these children are thinking from Mrs. Allen." Nonetheless, the chancellor also provided that "be sure you understand, I have had guardian ad litems who have made me recommendations before – guardian ad litems that I have as much respect for as I do Mrs. Allen – and I have . . . come to a different conclusion." Thereafter, despite recommendation to the contrary, the chancellor granted Tim "sole physical custody with Rachel having liberal rights of visitation."

¶28.    According to this Court, "there is no requirement that the chancellor defer to the findings of the guardian ad litem . . . . Such a rule would intrude on the authority of the chancellor to make findings of fact and to apply the law to those facts." ***S.N.C. v. J.R.D.***, 755 So. 2d 1077, 1082 (Miss. 2000). Moreover, this Court has stated that only "when a chancellor's ruling is contrary to the recommendation of a *statutorily required* guardian ad litem," should "the reasons for not adopting the guardian ad litem's recommendation . . . be stated by the court in the findings of fact and conclusions of law." ***Id***. (emphasis added).

Here, the chancellor was not statutorily required to appoint a guardian ad litem. Furthermore, the chancellor expressly stated his disagreement with Allen regarding Dan's impact on the Porter children and clearly outlined his reasoning in granting sole physical custody to Tim. We affirm the chancery court as to this issue.

### III.     Whether the chancellor erred in modifying child support.

¶29.     According to Tim's "Motion to Quash Subpoenae Duces Tecum and Motion for Protective Orders," later granted by the court, this case "is a custody action only.  There are no financial issues pending, Rachel . . . has asked the Court to modify Tim's 'physical periods of custody,' not child support. *Tim has asked the Court to modify physical custody, with no prayer for child support whatsoever*."  (Emphasis added.)  Nonetheless, the court imposed child support obligations on Rachel.

¶30.     "An award of child support is a matter within the discretion of the chancellor and we will not reverse that determination unless the chancellor was manifestly wrong in his finding of fact or manifestly abused his discretion." *Dufour v. Dufour*, 631 So. 2d 192, 194 (Miss. 1994) (quoting *Gillespie v. Gillespie*, 594 So. 2d 620, 622 (Miss. 1992)).  Mississippi Code Section 93-5-23 provides that, following the initial decree, a chancellor may "on petition, change the decree, and make from time to time such new decrees as the case may require." Miss. Code Ann. § 93-5-23 (Rev. 2004).  Moreover, "[a]n order that does not require a non-custodial parent to pay child support should be entered only in rare circumstances." *Rush*, 932 So. 2d at 799 (citing *Knutson v. Knutson*, 704 So. 2d 1331, 1334 (Miss. 1997)).

¶31.     However, although Mississippi Code Section 93-5-23 "grants the chancellor broad equitable authority regarding the support of minor children, to order such support without the

custodial parent's requesting it by a pleading is an arbitrary deprivation of due process." *Massey*, 799 So. 2d at 909 (citing *Fortenberry v. Fortenberry*, 338 So. 2d 806, 807 (Miss. 1976)). In this case, Rachel "was not provided notice that she 'might be required to defend a claim of child support' nor was there a 'suggestion in the record that support payments from [Rachel] were even being contemplated by the court on its own or asked for by' [Tim]." *Massey*, 799 So. 2d at 910 (quoting *Morris v. Morris*, 359 So. 2d 1138, 1139 (Miss. 1978)). Accordingly, this Court reverses the chancery court's imposition of child-support obligations upon Rachel. In so ruling, "[w]e suggest no view on the merits of a properly raised issue of support, as our decision is based on procedurally inadequate notice." *Massey*, 799 So. 2d at 910.

**IV.    Whether the chancellor abused his discretion in denying Rachel's "Motion for Relief from Judgment."**

¶32.    Following Dan's termination, Rachel filed a "Motion for Relief from Judgment" pursuant to Mississippi Rule of Civil Procedure 60(b)(5) and (6). At the subsequent hearing, the chancellor acknowledged that he "based the entire judgment on the fact that Rachel and Dan and their family were moving to Memphis[,]" but further found that Dan's termination was, and another move in response to a future job offer is, "foreseeable." As such, he reaffirmed his *Albright* analysis from several months prior, that he was "convinced that these children staying here with Tim was the best thing for them[,]" and denied Rachel's "Motion for Relief from Judgment."

¶33.    Mississippi Rule of Civil Procedure 60 states, in pertinent part, that:

> **(b) Mistakes; Inadvertence; Newly Discovered Evidence; Fraud, etc.** On
> motion and upon such terms as are just, the court may relieve a party or his

20

legal representative from a final judgment, order, or proceeding for the following reasons: . . .

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application;

(6) any other reason justifying relief from the judgment.

Miss. R. Civ. P. 60(b)(5) & (6). One who proceeds under either Rule 60(b)(5) or 60(b)(6) must do so "within a reasonable time . . . ." Miss. R. Civ. P. 60(b). Under Rule 60(b)(5), relief from judgment is appropriate if "it is no longer equitable that the judgment should have prospective application . . . ." Miss. R. Civ. P. 60(b)(5). "Relief under Rule 60(b)(6) is reserved for extraordinary and compelling circumstances." *Briney v. United States Fid. & Guar. Co.*, 714 So. 2d 962, 966 (Miss. 1998) (citations omitted). "Rule 60(b)(6) 'stands as a grand reservoir of equitable power to do justice in a particular case when relief is not warranted by the preceding clauses, or when it is uncertain that one or more of the preceding clauses afford relief.'" *Id*. at 969 (quoting *Accredited Surety & Cas. Co. v. Bolles*, 535 So. 2d 56, 60 (Miss. 1988) (quoting *Bryant, Inc. v. Walters*, 493 So. 2d 933, 939 (Miss. 1986))). On appeal:

> when considering the grant or denial of a 60(b)(6) motion, this Court will not reverse unless convinced that the Circuit Court has *abused its discretion*. [*Burkett v. Burkett*, 537 So. 2d 443, 446 (Miss. 1989)]. "Generally, consideration of a Rule 60(b) motion requires that a 'balance . . . be struck between granting a litigant a hearing on the merits with the need and desire to achieve finality.'" [*Lose v. Illinois Cent. Gulf R.R.*, 584 So. 2d 1284, 1286 (Miss. 1991) (quoting *Stringfellow v. Stringfellow*, 451 So. 2d 219, 221 (Miss. 1984))].

*Briney*, 714 So. 2d at 966 (emphasis added). *See also Stringfellow*, 451 So. 2d at 221 ("motions for relief under Rule 60(b) are generally addressed to the sound discretion of the trial court and appellate review is limited to whether that discretion has been abused.").

¶34. Although Rachel's anticipated move to Memphis and "Petition to Modify Defendant's Periods of Physical Custody" precipitated this action, the chancellor's subsequent *Albright* analysis favored Tim on factors unrelated to Rachel's anticipated move, including "parenting skills" and "stability of the home environment and employment of the parent." *See* ¶ 13 *supra*. Thereafter, "[t]he chancellor, having been alerted to the change in [Rachel's] plans, found no reason to change his decision. We find nothing in the new assertions to undermine the custody decision that had already been reached." *Turner v. Turner*, 824 So. 2d 652, 659 (Miss. Ct. App. 2002).

¶35. In short, the chancellor offered justification for finding that the children's "best interest would be served by granting [Tim] sole physical custody with Rachel having liberal rights of visitation[,]" unrelated to Rachel's anticipated move to Memphis. Such reasoning, combined with the chancery court's perception of litigation-related strain between Rachel and Tim, convinced the court to deny Rachel's "Motion for Relief from Judgment." Although other judges may have ruled differently, we cannot conclude that the chancellor abused his discretion in so ruling. *See Crosby v. State*, 760 So. 2d 725, 728 (Miss. 2000) ("[w]e do not find an abuse of discretion in his ruling, even though we might have ruled otherwise.").

¶36. We agree with the Court of Appeals that this case should be remanded. The existing schedule divides the children's time between Jackson and Memphis. The chancellor shall

22

establish a new visitation schedule, taking into consideration that both parents live in the Jackson, Mississippi, area.

## CONCLUSION

¶37. Accordingly, this Court affirms the chancery court's: (1) modification of the Agreement granting Tim sole custody with liberal visitation rights for Rachel; (2) discretionary rejection of the guardian ad litem's recommendation; and (3) denial of Rachel's "Motion for Relief from Judgment." This Court reverses the chancery court's imposition of child-support obligations upon Rachel, and reverses and remands for revision of the visitation schedule. Therefore, the judgment of the Court of Appeals is also affirmed in part and reversed in part, and this case is remanded to the Chancery Court of Madison County for proceedings consistent with this opinion.

¶38. **AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**

**CARLSON, P.J., DICKINSON, LAMAR AND PIERCE, JJ., CONCUR. GRAVES, P.J., AND KITCHENS, J., CONCUR IN RESULT ONLY. WALLER, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. CHANDLER, J., NOT PARTICIPATING.**

**WALLER, CHIEF JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶39. This is undoubtedly a tough case. But we cannot escape the fact that, pursuant to the clear language of Mississippi Code Section 93-5-24(6), the material change in circumstances must occur *before* the custody modification may be ordered. Miss. Code Ann. § 93-5-24 (Rev. 2004). I would hold that the chancellor erred in granting a custody modification based on a material change in circumstances that had not yet occurred. Therefore, I respectfully dissent from the majority's resolution of the modification issue.

23

¶40. Mississippi Code Section 93-5-24(6) is the statutory standard for modifying a joint-custody order. It provides that "[a]ny order for joint custody may be modified or terminated . . . upon the petition of one (1) parent showing that a material change in circumstances *has occurred*." Miss. Code Ann. § 93-5-24(6) (Rev. 2004) (emphasis added). As can be seen, the timing of the occurrence of the material change is in the past tense. *Griffith's Mississippi Chancery Practice* thus states that "[j]oint custody arrangements may be modified if they become impractical *after* one of the parties moves." Billy G. Bridges and James W. Shelton, *Griffith's Mississippi Chancery Practice* § 704b (2000) (citing ***Massey v. Huggins***, 799 So. 2d 902, 906 (Miss. Ct. App. 2001)) (emphasis added). *Griffith's* further states that "[t]he rule [is] that there must be a material change of circumstances . . . *before* a child custody order may be modified . . . ." *Id.* (emphasis added). Pursuant to the statute, therefore, the parent petitioning for a modification must show that a material change *has already occurred*, *i.e.*, at some point after the original joint custody order *but before the petition for modification*.[16]

¶41. Tim and Rachel petitioned for custody modifications in January and February 2006, respectively. At that time, Rachel had not yet moved to Memphis, and she did not intend to do so until May 2006, when the children finished out the school year in Jackson. Rachel had not yet moved at the time of the chancellor's modification order in July, either. She had

---

[16] This interpretation of the statute is further supported by *Griffith's*, which states that a chancery court "judgment operates upon the situation of the parties, as respects their several rights and liabilities, *at the time of the institution of the action*." *Griffith's*, *supra*, at § 620 (emphasis added). Or, if there are newly discovered or supervening facts, "the facts as they exist *at the time of the rendition of the judgment* may govern rather than those originally pleaded." *Id.* (emphasis added).

postponed her relocation due to the pending custody modification-proceedings, and she further postponed the move after the chancellor issued the modification order.

¶42. However, the chancellor couched his modification order in terms of the past tense. He concluded that "Rachel's move to the State of Tennessee *has made* the present joint physical and legal custody arrangement impractical and as such constitutes a material change in circumstances adverse to the children's best interest." (Emphasis added.) The chancellor made these determinations and denied Rachel's post-trial motions at times when the purported material change in circumstances had not yet occurred. Later, at the hearing on Rachel's motion to set aside the judgment, the chancellor admitted that he had "based the entire judgment on the fact that Rachel and Dan and their family were moving to Memphis." But the chancellor denied her motion anyway, finding that it was "equally foreseeable" that Dan and Rachel would move again in the future. The problem with this analysis is that the material change in circumstances had not occurred.

¶43. The majority notes that, "[a]t trial, both Rachel and Dan testified that Rachel's anticipated move to Memphis was certain regardless of the court's decision." *See* Maj. Op. at ¶ 24. But the fact that Rachel's move was "imminent" or that another move was foreseeable after the first one failed cannot serve as the basis for a material change in circumstances. The Supreme Court of Georgia explained it well when it held that:

> [w]hile the probabilities may be high that the alleged changes contemplated for the future will occur, it is by no means certain that they will. Events which might happen in the future, no matter how substantial they may be, can not authorize a modification of a [custody] decree until they come to pass.

25

*North v. North*, 209 Ga. 883, 885, 76 S.E.2d 617, 618 (1953); *see also Johnson v. Lewis*, 12 S.W.3d 379, 385 (Mo. Ct. App. 2000) (noting that "at the time of the hearing, Father had not actually moved to Arkansas[,]" and holding that "if [a change in circumstances] has not yet occurred, the court lacks jurisdiction to alter the [custody] decree on that basis").

¶44. It is my opinion that, under the clear terms of the statute, the chancellor erred in prematurely ordering the custody modification in this case because Rachel's anticipated move never, in fact, occurred.

¶45. Although the court's ability may be limited by the joint-custody modification statute, the remedial powers of chancery court are marked by plasticity. *Hall v. Wood*, 443 So. 2d 834, 842-43 (Miss. 1983). Therefore, in exceptional and exigent circumstances, the chancellor may call upon the chancery court's "broad equitable powers" to modify custody based on an anticipated, as opposed to realized, material change in circumstances. But that should be the exception, not the rule. If the Legislature wishes to address various public-policy concerns and allow custody modifications based on anticipated changes, the Legislature obviously may do so.

¶46. Nonetheless, the majority asserts that "we have previously found . . . no error in pre-move petitions and orders to modify custody in both sole and joint custody contexts." *See* Maj. Op. at ¶ 25. Thus, as the majority contends, by amending Section 93-5-24 after we decided those cases, the Legislature has acquiesced in our interpretation of the statute to allow custody modifications based on anticipated changes. However, the cases the majority cites do not stand as the rule but the exception.

¶47. *Lackey v. Fuller* involved one parent relocating to New York; and *Spain v. Holland* involved a move to England. *Lackey v. Fuller*, 755 So. 2d 1083 (Miss. 2000); *Spain v. Holland*, 483 So. 2d 318 (Miss. 1986). There is a significant difference between a sole custodian relocating to a foreign country, as in *Spain v. Holland*, and a joint custodian moving only 210 miles away to Tennessee, as in this case. *Spain*, 483 So. 2d at 321. Even *Lackey*, the only Mississippi joint custody case included in the majority's argument, dealt with a move more than 1,200 miles away. *Lackey*, 755 So. 2d at 1088. Due to the distances of the parent's move, those cases involved exactly the kind of exceptional and exigent circumstances that could allow the chancellor to use his equitable powers and order a pre-move custody modification. But they do not stand for this Court's interpretation of Section 93-5-24, and have not been incorporated into the statute by the Legislature's amendment thereof.[17]

---

[17] Also, neither *Lackey* nor *Spain* specifically addressed the propriety of modifications based on anticipated changes. *Lackey* primarily discusses the effect on an existing joint custody arrangement of one parent's move to New York. *See Lackey*, 755 So. 2d at 1088 (finding that move renders joint custody arrangement unworkable and thus requires modification even without adverse effect on the children). *Spain* is primarily concerned with whether a relocation alone has an adverse effect on the children in a sole custody situation. *See Spain*, 483 So. 2d at 321 (finding that move alone is not adverse effect but noting that our trial courts may consider "peculiar or unusual circumstances adversely affecting the children over and above the effect attendant upon the mere increase in miles between the children and the noncustodial parent"). Finally, the other cases cited by the majority are from other states and involve relocations to far more distant locales. *See In re Marriage of Nodot*, 401 N.E.2d 1189, 1194 (Ill. App. Ct. 1980) (planned move from Illinois to Indonesia)*; Brown v. Brown*, 621 N.W.2d 70 (Neb. 2000) (planned move from Nebraska to New York); *McGuinness v. McGuinness*, 970 P.2d 1074 (Nev. 1998) (planned move from Nevada to West Virginia). As such, those cases have no bearing upon this Court's interpretation of Mississippi law or the Legislature's adoption of it.

¶48.　In custody matters, we have said that "we never depart from our "polestar consideration: the best interest and welfare of the child." ***Albright***, 437 So. 2d at 1005. Everyone involved in this case – the parents, the chancellor, the guardian ad litem, and this Court – agrees that the previous joint-custody arrangement was in the children's best interests.　Hence, I believe that the best interests and welfare of the children have not been respected by the majority's affirmance of the chancellor's premature custody modification. This is a serious problem.

¶49.　Therefore, I must respectfully dissent from the majority's decision to affirm the chancellor's custody modification.